No. 25-3090

Civil

---

**In the United States Court of Appeals**

**for the Eighth Circuit**

---

Jose Osorio-Calderon,

Appellant,

v.

Warden, FCI Sandstone,

Appellee.

---

*Appeal from the*

*United States District Court for the*

*District of Minnesota*

---

# Appellant's Addendum

---

Trevor N. Parkes
Attorney ID No. 0402172
Counsel & Project Director, First Step Act Resource Center
National Association of Criminal Defense Lawyers
1660 L St NW, 12th Floor
Washington, DC 20036
Phone number: (202) 465-7665
Email: tparkes@nacdl.org

*Appointed Counsel for Appellant Jose Osorio-Calderon*

**TABLE OF CONTENTS**

R. Doc. 20 Report and Recommendation…………………………………….......1

R. Doc. 27 Order Rejecting Report and Recommendation and Dismissing Habeas Petition…………………………………………………………………......19

R. Doc. 13-2 Mr. Osorio-Calderon's FSA Time Assessment………………………31

18 U.S.C. § 3624……………………………………………………………..34

18 U.S.C. § 3632……………………………………………………………..39

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Jose Osorio-Calderon,

Petitioner,

v.

Warden FCI Sandstone,

Respondent.

Case No. 25-cv-398 (LMP/DLM)

**REPORT AND RECOMMENDATION**

---

Before the Court is Petitioner Jose Osorio-Calderon's Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241. (Doc. 6.) In his petition, Mr. Osorio-Calderon raises a single challenge: he claims that the Federal Bureau of Prisons ("BOP") should have transferred him from prison to prerelease custody in a residential reentry center ("RRC") or home confinement by applying his earned First Step Act ("FSA")[1] time credits ("FTCs"), and that the BOP is violating the FSA by failing to immediately do so. He properly names as Respondent the Warden of his BOP facility at the Federal Correctional Institution located in Sandstone, Minnesota. The BOP argues that the FSA does not entitle an imprisoned person to placement at a prerelease location at any specific time, nor does the vehicle of a habeas petition allow a petitioner to challenge the location of their

[1] Congress enacted the First Step Act in 2018 in an effort to reduce the federal prison population while also creating mechanisms for maintaining public safety by reducing recidivism risk. *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (2018); *see also* Congressional Research Service, *The First Step Act of 2018: An Overview*, at 1, https://perma.cc/9EJ4-2ZJ8 (2019).

**Appellant's Addendum 1**

confinement. The petition comes before the Court for review under Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts,[2] and has been referred to the undersigned magistrate judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. For the reasons below, the Court recommends that Mr. Ocasio-Calderon's petition be granted, and Mr. Osorio-Calderon be transferred to prelease custody within five days of any order adopting this Report and Recommendation.

**BACKGROUND**

A federal court in the District of Puerto Rico sentenced Mr. Osorio-Calderon on January 30, 2018, to a 151-month term of imprisonment for coercion and enticement of a minor to engage in sexual activity in violation of 18 U.S.C. § 2422(b). (Doc. 13, Apple Decl., Ex. A at 2.) Once a person is sentenced to a term of federal imprisonment, as Mr. Osorio-Calderon was, the person is committed to the BOP's custody until that person's sentence expires or they are entitled to earlier release for good conduct. 18 U.S.C. § 3621(a). Congress also gave the BOP general authority—subject to other statutory carve-outs—to designate the location of a prisoner's confinement, their security designation, their programmatic needs, their health needs, their faith-based needs, and other matters similarly related to their conditions during imprisonment. *Id.* § 3621(b). The BOP has thus housed Mr. Osorio-Calderon in various locations during his term of incarceration, including, but

[2] Mr. Ocasio-Calderon does not bring his habeas petition pursuant to 28 U.S.C. § 2254. Nevertheless, the Court may apply the Rules Governing Section 2254 Cases to his petition. *See* Rule 1(b).

not limited to, the Federal Correctional Institution in Texarkana, Texas ("TEX"), the Federal Correctional Institution in Seagoville, Texas ("SEA"), the Federal Transfer Center in Oklahoma City, Oklahoma ("OKL"), and his current location at the Federal Correctional Institution in Sandstone, Minnesota. *See* BOP, *Our Locations*, https://perma.cc/H2RL-PGTW (last visited June 17, 2025).

Mr. Osorio-Calderon's petition focuses on one of the statutory carve-outs that he claims alters the BOP's discretion over some matters related to his imprisonment: the FSA. One effect of the FSA's enactment in 2018 was a new statutory requirement that the BOP develop a system to assess imprisoned individuals' programmatic needs and give them opportunities to participate in needs-based programming. *See* 18 U.S.C. §§ 3621(h), 3632(d). The BOP did so, and it deemed Mr. Osorio-Calderon eligible to participate in the FSA's assessment and programming opportunities while incarcerated. (Doc. 13, Apple Decl., ¶¶ 4–5; *id.*, Ex. B.) One incentive for participation in FSA programming is the ability to earn the previously mentioned FSA time credits ("FTCs"). These FTCs can be applied to shorten the time from an inmate's release date to their supervised release period, as well as their date for eligibility to be placed in home confinement or an RRC before release. 18 U.S.C. § 3632(a)(7), (d)(4).

It is undisputed that Mr. Osorio-Calderon has indeed earned FTCs for participating in qualifying programming and activities. He has earned 10 FTCs for every 30 days of participation from December 21, 2018, through July 17, 2019, after which he began to earn 15 FTCs for every 30 days of participation. (Doc. 13, Apple Decl. ¶ 10; *id.*, Ex. B.) The BOP represents that, as of April 2, 2025, Mr. Ocasio-Calderon had earned 1,095 FTCs, 365

of which could be applied to his early release according to the FSA, and the rest of which could be credited towards prerelease placement in an RRC or home confinement. (*Id.* ¶ 11; *id.*, Ex. B.) When the BOP applies Mr. Osorio-Calderon's 365 days earned under the FSA against his 181-month sentence set to end on July 3, 2027, his projected FSA-based release date is July 3, 2026. (*Id.* ¶ 12; *id.*, Ex. B.) This is the anticipated release date currently listed on the BOP's website for Mr. Osorio-Calderon. BOP, *Find an Inmate*, https://perma.cc/Q32A-XN8Q (last visited June 17, 2025).

Mr. Osorio-Calderon has earned more FTCs than 365, and under the FSA, such credits hasten his start date for prerelease custody. The FSA contemplates that "[t]ime credits earned . . . by prisoners who successfully participate in recidivism reduction programs or productive activities shall be applied toward time in prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). This process is effected by the BOP which "shall transfer eligible prisoners . . . into prerelease custody or supervised release." *Id.* Based on the BOP's April 2, 2025 calculations, Mr. Osorio-Calderon's prerelease custody eligibility date would be 730 days before July 3, 2026, or July 3, 2024—a date now long passed.

As of April 2, 2025, the BOP in fact determined that Mr. Osorio-Calderon's conditional prerelease custodial placement date would be July 3, 2024. (Doc. 13, Apple Decl., Ex. B.) It also determined that his prerelease custodial placement should be in Puerto Rico where he would report for his period of supervised release. (*Id.* ¶ 16; *id.*, Ex. F.)[3] Mr.

[3] Mr. Osorio-Calderon asked the BOP to investigate placement in Northern District of New York to be near his sister. (Docs. 6, Ex. 2(c); 13, Apple Decl., ¶ 15.) The BOP denied this

Osorio-Calderon's Unit Team thus requested his placement in an RRC in Puerto Rico for 915 days before Mr. Osorio-Calderon's July 3, 2026 early release date—the total number of FTCs beyond his 365 applied to early release combined with the Unit Team's Second Chance Act recommendation.[4] (*Id.* ¶ 17; *id.*, Ex. G.) If approved, Mr. Osorio-Calderon's prerelease custodial placement date would have begun even earlier on December 31, 2023. However, the RRC in Puerto Rico denied the request, claiming placement was not possible because of local ordinances related to sex offenders' proximity to locations with minors at nearby schools or daycare centers in Puerto Rico, which they found applicable to Mr. Osorio-Calderon's criminal offense. (*Id.* ¶ 18; *id.*, Ex. H.) The BOP represents that no other

placement request because it found the residence unsuitable for supervision. (Docs. 6, Ex. 2(c); 13, Apple Decl., ¶ 15; *id.*, Ex. F.)

[4] Under the Second Chance Act of 2007 ("SCA"), the BOP must consider whether each inmate in its custody should be placed in an RRC for up to 12 months or home confinement for up to six months at end of their sentence. 18 U.S.C. § 3624(c)(1). The BOP must consider the factors below when determining which facility is suitable for each individual prisoner:

> (1) the resources of the facility contemplated;
> (2) the nature and circumstances of the offense;
> (3) the history and characteristics of the prisoner;
> (4) any statement by the court that imposed the sentence--
>> (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
>> (B) recommending a type of penal or correctional facility as appropriate; and
>
> (5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

18 U.S.C. § 3621(b)(1)–(5). A prisoner's "Unit Team" reviews each inmate for possible prerelease to an RRC or home confinement and makes a referral to the BOP based on the factors under § 3624(b) and other factors "unique to the individual inmate and of which the inmate's Unit Team has unique knowledge and insight." (Doc. 13, Apple Decl. ¶ 14.)

facilities are a viable prerelease placement for Mr. Osorio-Calderon in Puerto Rico. (*Id.* ¶ 18; *id.*, Ex. I.)

Mr. Osorio-Calderon claims that he was eligible for prerelease custody at least by mid-September 2024 based on the BOP's FSA time credit assessment from November 2, 2024. (Doc. 6 at 8, ¶¶ 1, 16; *id.*, Ex. 3.) When he understood no such transfer to prerelease custody would occur, he appealed the BOP's failure to place him in prerelease custody using the BOP's administrative grievance processes, seeking immediate placement in prerelease custody. (*Id.* at 2–4.) He filed an informal request ("BP-8") and received an informal decision denying his request on August 17, 2024 (*id.* at 2; *id.*, Ex. 2(a)), which he appealed to no avail, receiving a denial in response by the warden of his facility on September 4, 2024 ("BP-9") (*id.* at 2; *id.*, Ex. 2(b)). He then submitted a formal request to the regional office ("BP-10"), which the BOP denied on September 23, 2024 (*id.* at 3; *id.*, Ex. 2(c)), followed by a final central office appeal ("BP-11") denied on November 5, 2024 (*id.* at 4; *id.*, Ex. 2(d)). In each of these requests and appeals, Mr. Osorio-Calderon claimed his prerelease custody was set to start but the BOP was wrongly denying him transfer, and the BOP representatives responded that without a viable prerelease placement location, Mr. Ocasio-Calderon did not qualify for prerelease placement at the time of his requests and appeals. (*Id.*, Exs. 2(a)–(d).) In the BOP's final decision, the representative noted that while "[BOP] staff refer inmates for pre-release placement to the appropriate [RRC], . . . the final decision as to the community program or placement length is within the discretion of the RR[C]." (*Id.*, Ex. 2(d).) The representative also advised that "[n]o inmate is entitled to either [RRC] placement or placement of a particular duration." (*Id.*)

Based on these denials, Mr. Osorio-Calderon now petitions this Court to review the BOP's failure to place him in prerelease custody based on his earned FTCs and order his immediate transfer to prerelease custody based on the FSA, or alternatively, issue a writ of mandamus under 28 U.S.C. § 1361 requiring that the BOP transfer him to prelease custody. (*Id.* at 16 ¶¶ 1, 3.)

The BOP asks the Court to dismiss Mr. Osorio-Calderon's petition because the Court lacks jurisdiction to review the BOP's decisions about a prisoner's place of confinement. (Doc. 12 at 1.) The BOP also argues that, even if the Court had jurisdiction, no federal law entitles Petitioner to be transferred to prerelease custody at any particular time. (*Id.*)

During briefing on the petition, the Supreme Court issued its decision in *Trump v. J. G. G.*, 604 U.S. --, (2025) (per curiam), and the Court ordered supplemental briefing "on whether federal habeas law concerning place of confinement has changed, and if so, how the Court should apply it to the instant habeas petition." (Doc. 16.) Supplemental briefing is complete, and the petition is now ripe for review.

**DISCUSSION**

A federal court may grant habeas relief to a prisoner who, among other things, "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). A writ of habeas corpus under § 2241 is available to a federal prisoner who does not challenge the legality of their sentence, but rather, its execution after their conviction. *See Matheny v. Morrison*, 307 F.3d 709, 711 (8th Cir. 2002). This includes a challenge to the computation of a prisoner's sentence. *See Preiser v. Rodriguez*, 411 U.S.

475, 498 (1973) (petitions seeking "immediate release or a speedier release from . . . confinement" are "the heart of habeas corpus").

## I. THIS COURT HAS JURISDICTION TO REVIEW MR. OSORIO-CALDERON'S PLACE OF CONFINEMENT CLAIM.

Mr. Osorio-Calderon's claim concerns the date that his prelease custody should lawfully commence. The Eighth Circuit has historically treated such claims as "conditions-of-confinement" claims that federal courts lack jurisdiction to review because habeas permits only challenges to the fact or duration of a prisoner's confinement. *See Spencer v. Haynes*, 774 F.3d 467, 470–71 (8th Cir. 2014). Following this binding precedent, "[c]ourts in this District have thus repeatedly recognized that federal courts lack jurisdiction to review BOP decisions regarding a prisoner's confinement location." *Arellano v. Eischen*, No. 24-cv-2478 (JRT/DTS), 2024 WL 5358432, at *3 (D. Minn. Dec. 23, 2024) (collecting cases), *R. & R. adopted*, 2025 WL 295146 (D. Minn. Jan. 24, 2025). While such law has been clear and straightforward to apply, the Supreme Court recently addressed a habeas case in *Trump v. J.G.G.* that appears to complicate—if not upend—this precedent concerning whether courts have jurisdiction to review habeas petitions that challenge a prisoner's place of confinement.

The *J.G.G.* case arose out of the federal government's transfer "of Venezuelan immigrants detained in the United States to a foreign prison in El Salvador . . . without any due process of law . . . ." 145 S. Ct. at 1007 (Sotomayor, J., Kagan, J., Jackson, J., (dissenting) and Barrett, J., (dissenting in part)). In support of these transfers, President Donald J. Trump issued a Proclamation under the Alien Enemies Act ("AEA") to detain

and remove certain Venezuelan nationals because he claimed that they belonged to a foreign terrorist organization. *Id.* at 1005. A group of five of the Venezuelan nationals, on behalf of a putative class, filed a habeas petition that ultimately became a civil action under the Administrative Procedure Act ("APA"), seeking injunctive and declaratory relief against their removal under the Proclamation. *Id.* The District Court for the District of Columbia issued two temporary restraining orders ("TROs") preventing the noncitizens' removal and provisionally certifying a class of noncitizens subject to the Proclamation. *Id.* The D.C. district court extended the TROs, and the government sought an emergency stay of those orders, which the D.C. Circuit denied. *Id.* The government then asked the Supreme Court to vacate the orders. *Id.*

Relevant here, the Supreme Court granted the government's application to vacate the orders, holding that challenges to removal under the AEA were properly brought by filing a habeas corpus petition rather than a civil action bringing an APA claim because the claims necessarily implicated the validity of the detainees' confinement and removal—claims that "fall within the 'core' of the writ of habeas corpus and thus must be brought in habeas." *Id.* The Court then explained that "immediate physical release [is not] the only remedy under the federal writ of habeas corpus," noting that habeas is the proper vehicle to challenge one's death sentence or the enforcement a verdict in federal court with a term of incarceration in a state prison. *Id.* at 1005–06 (quoting *Peyton v. Rowe*, 391 U.S. 54, 67 (1968); citing *Nance v. Ward*, 597 U.S. 159, 167 (2022); *In re Bonner*, 151 U.S. 242, 254 (1894)). The Supreme Court also ruled that the proper venue for such "core" habeas petitions is the district of confinement, which meant that the noncitizens should have

brought their habeas petition in the District of Texas where they were confined rather than in the District of Columbia. *Id.* at 1005–06.

Taking a broad view of the per curiam opinion in *J.G.G.*—and setting aside the AEA, APA, and venue-related issues irrelevant to Mr. Osorio-Calderon's habeas petition—two fundamental implications from the *J.G.G.* decision emerge: petitioning for a writ of habeas corpus is the right vehicle to challenge the federal government's decision to transfer a person in their custody to a different location (or not), and federal courts have jurisdiction to hear such challenges brought by habeas petitions. Such challenges, to be clear, are place of confinement challenges. These conclusions are reinforced by Justice Kavanaugh's dissent which emphasizes that habeas has long provided the proper vehicle for challenges to transfers in both the extradition and wartime detainee contexts. *Id.* at 1007 ("And going back to the English Habeas Corpus Act of 1679, if not earlier, habeas corpus has been the proper vehicle for detainees to bring claims seeking to bar their transfers.") (Kavanaugh, J., dissenting).

The application of *J.G.G.* here is that this Court has jurisdiction to review the claim of Mr. Osorio-Calderon that the BOP should have, by statute, transferred him to prerelease custody sometime in 2024.[5] Petitioner has persuasively argued that the BOP urges too

---

[5] The BOP points out that the Court recently found it lacked jurisdiction to consider a petitioner's claim in *Walton v. Rardin*, No. 25-cv-1673 (NEB/DLM), (Doc. 6 (R. & R.)) (D. Minn. May 22, 2025). This case's facts are distinguishable. In *Walton*, the Petitioner asked the Court to "order the BOP to file a form needed to change his [Public Safety Factor]" which is a request to change "relevant factual information regarding the inmate's current offense, sentence, criminal history or institutional behavior that requires additional security measures be employed to ensure the safety and protection of the public," (*id.* at 2 (quoting Fed. Bureau of Prisons, U.S. Dep't of Justice, Program Statement P5100.08,

narrow of a reading of Eighth Circuit "conditions-of-confinement" caselaw limiting jurisdictional review of habeas claims challenging transfers (or lack thereof) required by federal statute. (Doc. 17 at 2.) The Court agrees that this greater breadth to what is cognizable under habeas law is exactly what the *J.G.G.* opinion highlights. The Court therefore finds that it does not lack jurisdiction to review Mr. Osorio-Calderon's transfer-related challenge brought in his habeas petition based on the holding in *J.G.G.* based on this Court's highest binding authority.

Even if *J.G.G.* does not provide this Court with jurisdiction to review Mr. Osorio-Calderon's habeas claim—which the Court has already found that it does—there is a second reason that jurisdiction exists to review his claim. At least one court in this District has persuasively found that courts have jurisdiction to review habeas claims that allege the BOP has violated federal law by failing to transfer an imprisoned person if a statute requires it. *See Garcia v. Eischen*, 24-cv-4106 (KMM/SGE) (Doc. 13 (R. & R.)) (D. Minn. Mar. 25, 2025) (citing *Fults v. Sanders*, 442 F.3d 1088, 1088–89 (8th Cir. 2006); *Elwood v. Jeter*, 386 F.3d 842 (8th Cir. 2004)). The *Garcia* court found that none of the prior caselaw allegedly depriving the court of jurisdiction applied because those cases predated the FSA or responded to different questions about it. (*Id.* at 6–8 ("This entitlement did not exist when *Kruger* [*v. Erickson*, 77 F.3d 1071 (8th Cir. 1996) (per curiam)] and *Spencer*[, 774

Inmate Security Designation and Custody Classification, ch. 5 at 7 (2006)). Ordering changes to an imprisoned individual's record does not invoke habeas relief in the Court's view, while Mr. Osorio-Calderon's claim that the BOP is violating the FSA's mandatory language that he be transferred to prerelease custody does.

F.3d at 469–71] were decided and was not asserted as a basis for relief in *Johnson* [*v. Birkholz*, No. 21-cv-2017 (PJS/LIB), 2022 WL 3135304 (D. Minn. Aug. 5, 2022)].").)

Like Mr. Garcia's petition, Mr. Osorio-Calderon's petition "alleges that the BOP's refusal to transfer him as mandated by the First Step Act violates federal law." (*Id.* at 8.) And like the BOP's response to Mr. Garcia's petition, the BOP's response to Mr. Osorio-Calderon's petition relies on *Kruger*, *Spencer*, and *Johnson*, among other opinions, to argue that the Court lacks jurisdiction to consider Petitioner's habeas claim. (Doc. 12 at 5–6.) For the same reasons as the *Garcia* court found, the Court finds Mr. Osorio-Calderon's habeas claim is cognizable because he alleges that the BOP is violating the FSA by failing to transfer him—a claim that no case Respondent cites puts beyond this Court's jurisdiction to review. This reasoning provides a secondary basis for finding the Court may now proceed to review Mr. Osorio-Calderon's habeas claim.

## II. THE FSA REQUIRES THE BOP TO TRANSFER MR. OSORIO-CALDERON TO PRERELEASE CUSTODY OR SUPERVISED RELEASE.

Turning to the merits of Mr. Osorio-Calderon's petition, he argues that the relevant language of the FSA is mandatory. He contends that the FSA mandates that the BOP "shall" transfer a qualifying person to prerelease custody, and that the BOP's failure to do so here is a violation of this federal statute. (Doc. 6 at 2 ¶ 6(c) (quoting 18 U.S.C. § 3632(d)(4)(C)).) The BOP contends that the Court should deny Mr. Osorio-Calderon's petition because he has no right under federal law to be transferred to prerelease custody at a specific time, or at all, because Congress left such matters to the discretion of the BOP. (Doc. 12 at 1–2.)

The task of interpreting what a statute means "begins with the statute's plain language,' and when 'the intent of Congress can be clearly discerned from the statute's language, the judicial inquiry must end.'" *Frost v. Lion Brand Yarn Co.*, 765 F. Supp. 3d 808, 812 (D. Minn. 2025) (quoting *Union Pac. RR Co. v. Surface Transp. Bd.*, 113 F.4th 823, 833 (8th Cir. 2024)). Congress's statutory language in § 3632(d)(4)(C) reads:

> Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities *shall* be applied toward time in prerelease custody or supervised release. The Director of the Bureau of Prisons *shall* transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release.

18 U.S.C. § 3632(d)(4)(C) (emphases added). Section 3624(g), in turn, sets forth definitions for who is an eligible prisoner, the types of prerelease custody, and other details to give effect to the FSA's requirements. *See* 18 U.S.C. § 3624(g).

This year the Supreme Court reconfirmed what it has held before—the meaning of "shall" is not up for dispute and "imposes a mandatory command." *Bufkin v. Collins*, 145 S. Ct. 728, 737 (2025) (quoting *Shapiro v. McManus*, 577 U.S. 39, 43 (2015)). In other words, "shall" is interchangeable with "must" in its meaning. *Id.* (quoting *Kingdomware Technologies, Inc. v. United States*, 579 U.S. 162, 171–72 (2016)). Thus, by the plain language of the statute, the BOP *must* transfer Mr. Osorio-Calderon to prerelease custody because he has met the conditions of the FSA for such a transfer: accruing sufficient FTCs by participating in relevant programming or activities. *Accord Garcia*, 24-cv-1406 (KMM/SGE) (Doc. 13 at 12).[6]

---

[6] Respondent has submitted a supplemental authority notice, citing an out-of-circuit district court's recent decision on various motions in a civil action brought by a putative class of

The BOP disagrees, arguing that it has general discretion under the SCA to make prerelease custody transfer decisions for all individuals sentenced to a term of imprisonment by considering particular factors, and to transfer individuals "to the extent practicable." *See* 18 U.S.C. § 3624(c)(1)–(2). The BOP contends that it is plain from the context Congress built in no factors for the BOP to consider prelease custody transfer decisions in the FSA's § 3632 provision because it assumed the BOP would apply the ones it had already provided it in § 3624.

This stretches the plain language beyond its reasonable interpretation. Nowhere in the FSA does Congress explain that the SCA is the parent statute containing "more generalized language" whose framework shall be used to understand and govern the subordinate FSA's language. (Doc. 12 at 9.) And the plain language of the FSA defies such a conclusion. The plain language states the BOP "shall" transfer a qualifying person—it leaves no discretionary need to weigh factors Congress did not supply in § 3632 because it leaves no discretion. The fact that Congress used "to the extent practicable" in § 3624 with factors to be weighed, but then used "shall" without such qualifiers in § 3632, further supports that Congress chose to use different language with a different meaning when

---

federally incarcerated individuals claiming the BOP should have transferred them to prerelease custody according to 18 U.S.C. § 3632(d)(4)(C). *See Vanessa Crowe & Glen Galemmo v. Fed. Bureau of Prisons et al.*, No. 24-cv-3582 (APM), 2025 WL 1635392 (D.D.C. June 9, 2025). In its decision, the D.C. Court analyzed whether a regulation promulgated by the BOP using permissive language concerning its ability to apply FTCs toward prerelease custody or supervised release contradicted the "shall" language at issue here in 18 U.S.C. § 3632(d)(4)(C). The court concluded such a challenge to the regulation failed because "shall" permitted the BOP discretion. *Id.* at *23. This Court is not bound by this authority and respectfully disagrees with its conclusions.

enacting the FSA. *See Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 279 (2018) ("We usually 'presume differences in language like this convey differences in meaning.'") (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017)); *see also Garcia*, 24-cv-1406 (KMM/SGE) (Doc. 13 at 13–14) (listing instances Congress used "to the extent practicable" in § 3624 to emphasize that Congress chose to exclude those words from § 3632(d)(4)(C)).

When transfer is mandatory, courts have held that the BOP lacks discretion to refuse or delay an eligible prisoner's transfer to prerelease custody. *See Woodley v. Warden, USP Leavenworth*, No. 24-cv-3053 (JWL), 2024 WL 2260904, at *3 (D. Kan. May 15, 2024) (citing *Doe v. Federal Bur. of Prisons*, 2024 WL 455309, at *1-4 (S.D.N.Y. Feb. 5, 2024) (transfer to prerelease custody was required despite the prisoner's participation in the witness protection program); *Ramirez v. Phillips*, 2023 WL 8878993, at *4 (E.D. Cal. Dec. 22, 2023) (agreeing with interpretation that transfer to prerelease custody is mandatory, BOP has no discretion not to transfer); *Komando v. Luna*, 2023 WL 310580, at *4–8 (D.N.H. Jan. 13, 2023) (transfer to prerelease custody was required despite outstanding detainer; rejecting argument that the BOP had discretion to determine which prisoners were suitable for placement in prerelease custody), *R. & R. adopted*, 2023 WL 1782034 (Feb. 6, 2023); *Sierra v. Jacquez*, 2022 WL 18046701, at *4 (W.D. Wash. Dec. 27, 2022) (transfer to prerelease custody required despite immigration detainer, rejecting argument for discretion), *R. & R. adopted*, 2023 WL 184225 (Jan. 13, 2023); *Jones v. Engelman*, 2022 WL 6563744, at *9–13 (C.D. Cal. Sept. 7, 2022) (transfer to prerelease custody was

mandatory despite pending charges and argument that the prisoner was a flight risk), *R. & R. adopted in relevant part*, 2022 WL 6445565 (Oct. 7, 2022)).

The BOP also argues that Mr. Osorio-Calderon has no protected liberty interest in serving his sentence at a particular location. (Doc. 12 at 10.) Mr. Osorio-Calderon petitions the Court to order his release to prerelease custody based on the FSA, claiming the BOP's statutory violation must be rectified by means of a writ of habeas corpus. (Doc. 6 at 6, 15–16.) He does not ask the Court to order his placement at any particular location. And the Court does not disagree that the FSA does leave the BOP with some discretion in where it locates Mr. Osorio-Calderon once he accrues FTCs through qualifying participation in programming or activities: the BOP may transfer him "into prerelease custody or supervised release," where prerelease custody can be either transfer to an RRC or home confinement. 18 U.S.C. § 3632(d)(4)(C). The Court makes no finding or recommendation as to which of these the BOP must select, nor what facility or location among those options it should choose.

One further issue merits mention here. The BOP has briefed and provided exhibits supporting its claim that it is impracticable to transfer Mr. Osorio-Calderon to prerelease custody because his Unit Team's investigations have not resulted in a viable placement location. (*See*, *e.g.*, Docs. 12 at 3–4; 13, Apple Decl., ¶¶ 15–20, Exs. F–I.) While acknowledging the practical challenge of placement, the Court, however, is just as bound by the plain language of the law as the BOP is where Congress has not created discretion to transfer "to the extent practicable," but has mandated such a transfer "shall" occur. 18

U.S.C. § 3632(d)(4)(C). The BOP's attestations about impracticality do not change the mandated action of transfer here.

In sum, the Court finds that the record establishes that Mr. Osorio-Calderon is eligible for transfer to an RRC or home confinement under the FSA. No evidentiary hearing is needed to reach these undisputed findings on the record before the Court. *See Wallace v. Lockhart*, 701 F.2d 719, 729–30 (8th Cir. 1983). Accordingly, 18 U.S.C. § 3632(d)(4)(C) requires the BOP to transfer Mr. Osorio-Calderon. The fact that the BOP has not done so means that Mr. Osorio-Calderon is being held in violation of federal law. The Court therefore recommends that such a transfer be ordered within five days of any order adopting this Report and Recommendation. Given this recommendation, the Court also shortens the objection period under Local Rule 72.2 of this District follows: Respondent's objections must be filed within **seven days** of this Report and Recommendation's issue date, and Petitioner's response must be filed within **four days** of Respondent's objections.

## RECOMMENDATION

Based on the above, and on all of the files, records, and proceedings in this case, **IT IS RECOMMENDED** that:

1. Petitioner Jose Osorio-Calderon's operative Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241 (Doc. 6) be **GRANTED**; and

2. Respondent be ordered to transfer Mr. Osorio-Calderon to prerelease custody or supervised release within five days of any order adopting this Report and Recommendation.

Date: June 18, 2025

*s/Douglas L. Micko*
DOUGLAS L. MICKO
United States Magistrate Judge

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served with a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served with a copy of the objections. *See* Local Rule 72.2(b)(2). However, by Court order above, the Court has abridged these deadlines, and Respondent's objections must be filed within **seven days** of this Report and Recommendation's issue date, with Petitioner's response filed within **four days** of Respondent's objections. All objections and responses must still comply with the word or line limits set forth in Local Rule 72.2(c).

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

JOSE OSORIO-CALDERON,

Petitioner,

v.

WARDEN FCI SANDSTONE,

Respondent.

Case No. 25-cv-398 (LMP/DLM)

**ORDER REJECTING REPORT AND RECOMMENDATION AND DISMISSING HABEAS PETITION**

Trevor Parkes, **National Association of Criminal Defense Lawyers, Washington, D.C.**, for Petitioner.

Trevor Brown, **United States Attorney's Office, Minneapolis, MN**, for Respondent.

Petitioner Jose Osorio-Calderon ("Osorio-Calderon") brought this habeas petition under 28 U.S.C. § 2241, claiming that the Federal Bureau of Prisons ("BOP") is required to transfer him from prison to prerelease custody by applying his earned First Step Act ("FSA") time credits ("FTCs"). *See* ECF No. 6. United States Magistrate Judge Douglas L. Micko issued a Report & Recommendation ("R&R") recommending that the petition be granted and that Osorio-Calderon be transferred to prerelease custody. ECF No. 20. The Government objected to the R&R, ECF No. 21, and Osorio-Calderon responded to the Government's objections, ECF No. 22. On a de novo review of the petition and the record, Fed. R. Civ. P. 72(b)(3), the Court declines to adopt the R&R, sustains the Government's objections, and dismisses the petition.

## BACKGROUND

A federal court in the District of Puerto Rico sentenced Osorio-Calderon on January 30, 2018, to a 151-month term of imprisonment for coercion and enticement of a minor to engage in sexual activity in violation of 18 U.S.C. § 2422(b). ECF No. 13-1 at 2. He is presently incarcerated at the Federal Correctional Institution in Sandstone, Minnesota ("FCI-Sandstone"). ECF No. 13 ¶ 3. As a person who is sentenced to a term of federal imprisonment, Osorio-Calderon is committed to the BOP's custody until his sentence expires or he is entitled to earlier release for good conduct. *See* 18 U.S.C. § 3621(a).

Relevant here, the FSA requires the BOP to provide inmates opportunities to participate in needs-based programming. *See* 18 U.S.C. §§ 3621(h), 3632(d). Osorio-Calderon has participated in such programming, which has allowed him to earn FTCs. ECF No. 13 ¶¶ 5, 10. FTCs can be applied to shorten the time from an inmate's release date to their supervised release period, as well as their date for eligibility to be placed in home confinement or a residential reentry center ("RRC") before release. *See* 18 U.S.C. § 3632(d)(4).

As of April 2, 2025, Osorio-Calderon had earned 1,095 days of FTCs, ECF No. 13 ¶ 11, 365 of which could be applied to his early release, *see* ECF No. 13-5 at 21. Accordingly, Osorio-Calderon's original release date of July 3, 2027, became July 3, 2026, after applying 365 days of FTCs. ECF No. 13 ¶ 4. As for the remaining 730 days of time credit that Osorio-Calderon had earned, federal law provides that those FTCs "shall be applied toward time in prerelease custody." 18 U.S.C. § 3632(d)(4)(C). This process is implemented by the BOP which "shall transfer eligible prisoners . . . into prerelease

**Appellant's Addendum 20**

custody." *Id.* Accordingly, Osorio-Calderon was eligible to be transferred into prerelease custody on July 3, 2024. ECF No. 13-2 at 3.

Osorio-Calderon initially requested prerelease custody placement in New York, where his sister lives and where he hoped to complete his supervised release. *See* ECF No. 13 ¶ 5. However, in March 2024, U.S. Probation and Pretrial Services for the Northern District of New York rejected Osorio-Calderon's request for supervised release in New York because his sister's residence was "not suitable for supervision." ECF No. 13-6. The BOP then began looking for prerelease custody placements in Puerto Rico, but in November 2024, the BOP's Residential Reentry Manager field office in Puerto Rico rejected RRC placement there, claiming placement was not possible because of local ordinances related to sex offenders' proximity to locations with minors at nearby schools or daycare centers, which was found applicable to Osorio-Calderon's criminal offense. ECF No. 13-8. In April 2025, Osorio-Calderon's case manager again contacted the BOP's Residential Reentry Manager field office in Puerto Rico, which again rejected Osorio-Calderon's request for an RRC placement. ECF No. 13-9. Therefore, despite being eligible for prerelease custody in July 2024, Osorio-Calderon remains incarcerated at FCI-Sandstone. ECF No. 13 ¶ 3.

After unsuccessfully attempting to compel his transfer to prerelease custody through administrative channels, ECF No. 6 at 2–3, Osorio-Calderon brought this habeas petition, ECF No. 1, which he later amended, ECF No. 6. Osorio-Calderon asks this Court to review the BOP's failure to place him in prerelease custody based on his earned FTCs and order his immediate transfer to prerelease custody based on the FSA, or alternatively, issue a writ

of mandamus under 28 U.S.C. § 1361, requiring that the BOP transfer him to prerelease custody. *Id.* at 15–16. The Government contends that the Court lacks jurisdiction to review the BOP's decisions about an inmate's conditions and place of confinement. ECF No. 12 at 4–10. During briefing on the amended petition, Magistrate Judge Micko asked the parties to brief the significance of the Supreme Court's recent decision in *Trump v. J. G. G.*, 604 U.S. 670 (2025) (per curiam), and discuss "whether federal habeas law concerning place of confinement has changed, and if so, how the Court should apply it to the instant habeas petition." ECF No. 16. The parties provided that supplemental briefing. ECF Nos. 17, 18.

On June 18, 2025, Magistrate Judge Micko issued an R&R recommending that Osorio-Calderon's habeas petition be granted. ECF No. 20. The R&R recognizes that the Eighth Circuit has long held that federal courts lack jurisdiction to review BOP decisions regarding an inmate's placement in prerelease custody because such claims relate to an inmate's conditions and place of confinement. *Id.* at 8. The R&R concludes, however, that *J. G. G.* "complicate[d] —if not upend[ed]—this precedent concerning whether courts have jurisdiction to review habeas petitions that challenge a prisoner's place of confinement." *Id.* After reviewing the Supreme Court's decision in *J. G. G.*, the R&R concludes that the Court has jurisdiction to review Osorio-Calderon's claim "that the BOP should have, by statute, transferred him to prerelease custody sometime in 2024." *Id.* at 8–11. After finding jurisdiction, the R&R concludes that the FSA requires the BOP to transfer Osorio-Calderon to prerelease custody. *Id.* at 12–17. The Government timely objected to the R&R's

jurisdictional and merits conclusions, ECF No. 21, to which Osorio-Calderon responded, ECF No. 22.

## ANALYSIS

If a party timely raises objections to a magistrate judge's recommended disposition of a case, the presiding district judge must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.*

"Congress has granted federal district courts, 'within their respective jurisdictions,' the authority to hear applications for habeas corpus by any person who claims to be held 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Rasul v. Bush*, 542 U.S. 466, 473 (2004) (quoting 28 U.S.C. § 2241(a), (c)(3)). However, federal courts lack jurisdiction to hear some types of habeas claims. Relevant here, if an inmate "is not challenging the validity of his conviction or the length of his detention, such as loss of good time, then a writ of habeas corpus is not the proper remedy." *Kruger v. Erickson*, 77 F.3d 1071, 1073 (8th Cir. 1996). Accordingly, a federal district court lacks jurisdiction to consider challenges to an inmate's conditions or place of confinement. *See id.*; *Spencer v. Haynes*, 774 F.3d 467, 470 (8th Cir. 2014); *see also* 18 U.S.C. § 3621(b).

In line with this precedent, courts within this District have routinely held that federal courts lack jurisdiction over habeas petitions that seek to transfer an inmate to prerelease custody under the FSA. *See, e.g.*, *Williamson v. Eischen*, No. 23-cv-2165 (ECT/DLM), 2024 WL 4151497, at *3–4 (D. Minn. Aug. 12, 2024) (explaining that "the Eighth Circuit

views requests for transfer to an RRC as challenges to a prisoner's *place* of confinement" and that "a writ of habeas corpus is not the proper remedy" for such claims), *report and recommendation adopted*, 2024 WL 4151331 (D. Minn. Sept. 11, 2024); *Gallop v. Segal*, No. 24-cv-1357 (JWB/DTS), 2024 WL 2946249, at *2 (D. Minn. May 14, 2024), *report and recommendation adopted*, 2024 WL 2943796 (D. Minn. June 11, 2024); *Martinez v. Eischen*, No. 23-cv-3178 (PJS/DLM), 2023 WL 7389935, at *1–2 (D. Minn. Oct. 18, 2023), *report and recommendation adopted*, 2023 WL 7388354 (D. Minn. Nov. 8, 2023); *Vang v. Eischen*, No. 23-cv-721 (JRT/DLM), 2023 WL 5417764, at *4 (D. Minn. Aug. 1, 2023), *report and recommendation adopted*, 2023 WL 5403793 (D. Minn. Aug. 22, 2023). That is because prerelease custody is not a *release* from custody; rather, prerelease custody is still a place of confinement. *See United States v. Houck*, 2 F.4th 1082, 1085 (8th Cir. 2021); *Williams v. Birkholz*, No. 20-cv-2190 (ECT/LIB), 2021 WL 4155614, at *6 (D. Minn. July 19, 2021) ("Being transferred to home confinement is not a 'release' [from] incarceration."), *report and recommendation adopted*, 2021 WL 4155013 (D. Minn. Sept. 13, 2021).

The R&R acknowledges this line of case law and recognizes that it would ordinarily doom Osorio-Calderon's petition. ECF No. 20 at 8. However, the R&R concludes that the Supreme Court's recent decision in *J. G. G.* upended this line of case law and authorizes this Court to exercise jurisdiction over Osorio-Calderon's petition. *Id.* at 8–11.

In *J. G. G.*, the Supreme Court addressed the proper mechanism for detained noncitizens to challenge the government's decision to deport them under the Alien Enemies Act ("AEA"). 604 U.S. at 671–72. In a short per curiam order, the Supreme Court held

**Appellant's Addendum 24**

that challenges to a detained noncitizen's removal under the AEA "must be brought in habeas." *Id.* at 672. The Supreme Court explained that "[r]egardless of whether the detainees formally request release from confinement, because their claims for relief necessarily imply the invalidity of their confinement and removal under the AEA, their claims fall within the core of the writ of habeas corpus and thus must be brought in habeas." *Id.* (citation modified). The Supreme Court then explained that "immediate physical release [is not] the only remedy under the federal writ of habeas corpus," noting that habeas is the proper vehicle to challenge one's death sentence or the enforcement of a verdict in federal court with a term of incarceration in a state prison. *Id.* (alteration in original) (first quoting *Peyton v. Rowe*, 391 U.S. 54, 67 (1968), then citing *Nance v. Ward*, 597 U.S. 159, 167 (2022); *In re Bonner*, 151 U.S. 242, 254 (1894)).

The R&R takes a "broad view of the per curiam opinion in *J. G. G.*" and concludes that "petitioning for a writ of habeas corpus is the right vehicle to challenge the federal government's decision to transfer a person in their custody to a different location." ECF No. 20 at 10. The R&R recognizes that such a challenge was to Osorio-Calderon's "place of confinement," but concludes that *J. G. G.* now allows such challenges to proceed in federal court. *Id.*

With due respect for the R&R's thoughtful analysis, this Court disagrees. District courts in the Eighth Circuit are duty bound to follow precedential decisions of the Eighth Circuit. *See Hood v. United States*, 342 F.3d 861, 864 (8th Cir. 2003). "Where a precedent . . . has direct application in a case, [courts] should follow it, even if a later decision arguably undermines some of its reasoning." *Bierman v. Dayton*, 900 F.3d 570,

574 (8th Cir. 2018) (citing *Agostini v. Felton*, 521 U.S. 203, 237 (1997)). District courts are therefore bound by Eighth Circuit decisions "until and unless the Supreme Court (or the circuit court sitting *en banc*) says otherwise," even if it appears that such a decision "conflicts with Supreme Court precedent." *Valspar Corp. v. PPG Indus., Inc.*, No. 16-cv-1429 (SRN/SER), 2017 WL 3382063, at *3 (D. Minn. Aug. 4, 2017) (collecting cases). That leaves to the Eighth Circuit the prerogative of overruling its own decisions. *See Agostini*, 521 U.S. at 237.

Here, as courts in this District have routinely held, the Eighth Circuit's decisions in *Kruger* and *Spencer* require dismissal of habeas petitions that seek an inmate's transfer to prerelease custody under the FSA because those petitions impermissibly raise a challenge to an inmate's place of confinement. *See, e.g.*, *Williamson*, 2024 WL 4151497, at *3–4; *Gallop*, 2024 WL 2946249, at *2; *Martinez*, 2023 WL 7389935, at *1–2; *Vang*, 2023 WL 5417764, at *4. Is it possible that *J. G. G.* upended the "place of confinement" rule for habeas petitions that seek an inmate's transfer to prerelease custody under the FSA? Potentially. But the habeas claim in *J. G. G.* arose in a completely different factual and legal context: a challenge to civil immigration detention under an eighteenth-century immigration law. *See J. G. G.*, 604 U.S. at 671. The habeas claim here, in contrast, challenges a criminal incarceration based on a twenty-first century criminal sentencing law. So, even if *J. G. G.* "arguably undermines" the reasoning of *Kruger* and *Spencer*, there is no question that those criminal habeas cases have "direct application" to this case. *Bierman*, 900 F.3d at 574. Until the Eighth Circuit or the Supreme Court say otherwise, this Court must follow *Kruger* and *Spencer* (and the wealth of other case law in this

District) and hold that the Court is without jurisdiction to consider Osorio-Calderon's petition.[1]

The R&R alternatively concludes that if *J. G. G.* does not furnish jurisdiction to consider Osorio-Calderon's petition, then the Court has jurisdiction to consider the petition because it alleges that BOP "violated federal law by failing to transfer an imprisoned person," as mandated by the FSA. ECF No. 20 at 11–12. The R&R's analysis proceeds as follows: because the FSA, through its mandatory language, requires the BOP to transfer Osorio-Calderson to prerelease custody when he becomes eligible, *see* 18 U.S.C. § 3632(d)(4)(C), and because federal courts have jurisdiction over habeas petitions that allege violations of federal law, *see Fults v. Sanders*, 442 F.3d 1088, 1088–89 (8th Cir. 2006), the BOP's failure to transfer Osorio-Calderon into prerelease custody is a violation of federal law that provides this Court with jurisdiction over his habeas petition.

It is undisputed, though, that a habeas petition which seeks transfer to prerelease custody is a challenge to the petitioner's place of confinement. *See Houck*, 2 F.4th at 1085. And 18 U.S.C. § 3621(b) provides that "*[n]otwithstanding any other provision of law*, a designation of a place of imprisonment under this subsection is not reviewable by any court." (Emphasis added). That means that "notwithstanding" the mandatory language in

[1] The Government cites *Smith v. Eischen*, a recent four-sentence, unpublished Eighth Circuit opinion that dismissed on mootness grounds a habeas petitioner's claim that his time credits had been incorrectly calculated. ECF No. 23 (citing No. 24-3575, 2025 WL 2319149, at *1 (8th Cir. Aug. 12, 2025)). It is unclear how *Smith* is relevant, as this case has nothing to do with the mootness doctrine. Nor did *Smith* explicitly discuss *J. G. G.* or the Eighth Circuit's place-of-confinement case law. Although the Government attempts to conjure an implied jurisdictional holding from what *Smith* does not say, what *Smith* actually says has little relevance to this case.

the FSA requiring transfer to prerelease custody, the BOP's decision to continue Osorio-Calderon's confinement at FCI-Sandstone is "not reviewable by any court." *See Crowe v. Fed. Bureau of Prisons*, No. 24-cv-3582 (APM), 2025 WL 1635392, at *21 (D.D.C. June 9, 2025) (explaining that Section 3632(d)(4)(C) "does not displace the statutory discretion that the BOP has to designate a place of imprisonment" under Section 3621(b)). Unless and until the Eighth Circuit decides that a habeas petition that seeks transfer to prerelease custody is *not* merely a challenge to the petitioner's place of confinement, Section 3621(b) appears to divest the Court of jurisdiction to consider Osorio-Calderon's petition.

Finally, Section 3621(b) forecloses Osorio-Calderon's alternative argument that he is entitled to an order that the BOP transfer him to prerelease custody under the federal mandamus statute. ECF No. 6 at 16.[2] Pursuant to 28 U.S.C. § 1361, a federal district court has original jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Mandamus may issue under Section 1361 against an officer of the United States only in "extraordinary situations" and when the plaintiff can establish: (1) a clear and indisputable right to the relief sought; (2) the officer has a nondiscretionary duty to honor that right; and (3) there is no other adequate remedy. *Mitchael v. Colvin*, 809 F.3d 1050, 1054 (8th Cir. 2016).

Here, Osorio-Calderon lacks a right to the relief sought because, again, Section 3621(b) and Eighth Circuit precedent provide that BOP's placement decisions—such as

[2] Because the R&R recommends granting Osorio-Calderon's habeas petition, it does not address Osorio-Calderon's alternative argument that he is entitled to mandamus relief.

the decision to transfer an inmate to prerelease custody—are "not reviewable by any court." *See Barnes v. Segal*, No. 23-cv-0939 (JRT/DLM), 2024 WL 418695, at *4 (D. Minn. Jan. 16, 2024), *report and recommendation adopted*, 2024 WL 416400 (D. Minn. Feb. 5, 2024). Section 3621(b)'s bar on judicial review applies regardless of the cause of action asserted. *See Ohio ex rel. Bristow v. Dir.*, No. 2:13-cv-614, 2013 WL 5408440, at *3 (S.D. Ohio Sept. 25, 2013) (applying Section 3621(b)'s bar on judicial review to a mandamus action). Osorio-Calderon is therefore not entitled to a writ of mandamus.

The Court empathizes with Osorio-Calderon, who has worked to accrue a significant number of FTCs, only to be met with bureaucratic finger-pointing that has kept him incarcerated at FCI-Sandstone—now for more than a year after he has been conditionally eligible for prerelease. It is not only a shame for Osorio-Calderon, but also for the criminal justice system, which is benefited by structured prerelease programs that facilitate an inmate's return to the community, thereby reducing recidivism and increasing the likelihood of their successful reintegration as a member of society. *See, e.g.*, 28 C.F.R. § 570.20. Although the Court is without authority to grant Osorio-Calderon his requested relief and recognizes the unique placement challenges for convicted sex offenders, the Court sincerely hopes that the BOP will work diligently and expeditiously to locate a suitable prerelease custody placement for Osorio-Calderon.

## CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The Government's Objections to the R&R (ECF No. 21) are **SUSTAINED**;

2. The R&R (ECF No. 20) is **REJECTED**; and

3. The amended petition (ECF No. 6) is **DISMISSED WITHOUT PREJUDICE**.

Dated: September 19, 2025

*s/Laura M. Provinzino*
Laura M. Provinzino
United States District Judge

# FSA Time Credit Assessment

**Register Number:49425-069, Last Name:OSORIO-CALDERON**

**U.S. DEPARTMENT OF JUSTICE** | **FEDERAL BUREAU OF PRISONS**

Register Number....: 49425-069
Inmate Name
Last.............: OSORIO-CALDERON
First............: JOSE
Middle...........: CARLOS
Suffix...........:
Gender.............: MALE
Start Incarceration: 01-30-2018

Responsible Facility: SST
Assessment Date.....: 04-02-2025
Period Start/Stop...: 12-21-2018 to 04-02-2025
Accrued Pgm Days....: 2264
Disallowed Pgm Days.: 30
FTC Towards RRC/HC..: 730
FTC Towards Release.: 365
Apply FTC to Release: Yes

| Start | Stop | Pgm Status | Pgm Days |
|---|---|---|---|
| 12-21-2018 | 07-17-2019 | accrue | 208 |

Accrued Pgm Days...: 208
Carry Over Pgm Days: 0
Time Credit Factor.: 10
Time Credits.......: 60

---

| Start | Stop | Pgm Status | Pgm Days |
|---|---|---|---|
| 07-17-2019 | 04-14-2023 | accrue | 1367 |

Accrued Pgm Days...: 1367
Carry Over Pgm Days: 28
Time Credit Factor.: 15
Time Credits.......: 690

---

| Start | Stop | Pgm Status | Pgm Days |
|---|---|---|---|
| 04-14-2023 | 05-14-2023 | disallow | 30 |

**Not in qualifying admit status.**

| Facility | Category | Assignment | Start | Stop |
|---|---|---|---|---|
| TEX | ARS | TRANSFER | 04-13-2023 09:04 | 04-13-2023 09:04 |
| B17 | ARS | A-ADMIT | 04-13-2023 10:04 | 04-13-2023 12:55 |
| SEA | ARS | A-BOP HLD | 04-13-2023 11:55 | 04-14-2023 03:42 |
| B17 | ARS | RELEASE | 04-13-2023 12:55 | 04-13-2023 12:55 |
| SEA | ARS | HLD REMOVE | 04-14-2023 03:42 | 04-14-2023 03:42 |
| B17 | ARS | A-ADMIT | 04-14-2023 04:42 | 04-14-2023 13:20 |
| OKL | ARS | A-BOP HLD | 04-14-2023 12:20 | 04-26-2023 09:00 |
| B17 | ARS | RELEASE | 04-14-2023 13:20 | 04-14-2023 13:20 |
| OKL | ARS | HLD REMOVE | 04-26-2023 09:00 | 04-26-2023 09:00 |
| A02 | ARS | A-ADMIT | 04-26-2023 10:00 | 04-26-2023 19:19 |
| CCC | ARS | A-BOP HLD | 04-26-2023 18:19 | 05-15-2023 08:01 |
| A02 | ARS | RELEASE | 04-26-2023 19:19 | 04-26-2023 19:19 |

---

| Start | Stop | Pgm Status | Pgm Days |
|---|---|---|---|

GOVERNMENT EXHIBIT
B
25-398 (LMP/DLM)

**Appellant's Addendum 31**

**FSA Time Credit Assessment**

**Register Number:49425-069, Last Name:OSORIO-CALDERON**

**U.S. DEPARTMENT OF JUSTICE** **FEDERAL BUREAU OF PRISONS**

05-14-2023 04-02-2025 accrue 689

Accrued Pgm Days...: 689
Carry Over Pgm Days: 15
Time Credit Factor.: 15
Time Credits.......: 345

**--- FSA Assessment(s) ---**

| # | Start | Stop | Assignment | Asn Start | Factor |
|---|---|---|---|---|---|
| 001 | 12-21-2018 | 01-18-2019 | R-LW | 04-28-2021 17:24 | 10 |
| 002 | 01-18-2019 | 07-17-2019 | R-LW | 04-28-2021 17:24 | 10 |
| 003 | 07-17-2019 | 01-13-2020 | R-LW | 04-28-2021 17:24 | 15 |
| 004 | 01-13-2020 | 07-11-2020 | R-LW | 04-28-2021 17:24 | 15 |
| 005 | 07-11-2020 | 01-07-2021 | R-LW | 04-28-2021 17:24 | 15 |
| 006 | 01-07-2021 | 07-06-2021 | R-LW | 04-28-2021 17:24 | 15 |
| 007 | 07-06-2021 | 01-02-2022 | R-LW | 04-28-2021 17:24 | 15 |
| 008 | 01-02-2022 | 07-01-2022 | R-LW | 04-28-2021 17:24 | 15 |
| 009 | 07-01-2022 | 12-28-2022 | R-LW | 01-22-2022 11:59 | 15 |
| 010 | 12-28-2022 | 06-26-2023 | R-LW | 07-16-2022 15:21 | 15 |
| 011 | 06-26-2023 | 12-23-2023 | R-LW | 01-14-2023 12:26 | 15 |
| 012 | 12-23-2023 | 06-20-2024 | R-LW | 10-05-2023 01:54 | 15 |
| 013 | 06-20-2024 | 12-17-2024 | R-LW | 05-22-2024 06:45 | 15 |
| 014 | 12-17-2024 | 06-15-2025 | R-LW | 11-07-2024 11:09 | 15 |

**Appellant's Addendum 32**

**FSA Time Credit Assessment**

**Register Number:49425-069, Last Name:OSORIO-CALDERON**

**U.S. DEPARTMENT OF JUSTICE** **FEDERAL BUREAU OF PRISONS**

**--- Best Case Scenario - Conditional Pre-release Planning & Preparation Only ------------------**

**All conditional days and conditional dates below are the individual's best case scenario given the individual's FSA/FTC status and best case Second Chance Act (SCA) days as of 04-02-2025. These dates can change if there are changes to one or more of the following: the individuals FSA risk, FSA opt-in/opt-out status, or best case SCA days.**

**SCA DAYS ARE NOT GUARANTEED AND REQUIRE AN INDIVIDUALIZED ASSESSMENT! THEREFORE, IF A DEFAULT OF 0 DAYS IS REFLECTED, THIS DATE IS SUBJECT TO CHANGE BASED ON THE REQUIRED FIVE-FACTOR REVIEW UNDER 18 USC SEC. 3621(B). AN INDIVIDUAL WHO HAS PENDING CHARGES/DETAINERS ARE NOT ELIGIBLE FOR SCA TIME. THE FIVE-FACTOR REVIEW INVOLVES THE FOLLOWING: (1)THE RESOURCES OF THE FACILITY CONTEMPLATED; (2) THE NATURE AND CIRCUMSTANCES OF THE OFFENSE; (3) THE HISTORY AND CHARACTERISTICS OF THE PRISONER; (4) ANY STATEMENT BY THE COURT THAT IMPOSED THE SENTENCE: (a)CONCERNING THE PURPOSES FOR WHICH THE SENTENCE TO IMPRISONMENT WAS DETERMINED TO BE WARRANTED; OR (b) RECOMMENDING A TYPE OF PENAL OR CORRECTIONAL FACILITY AS APPROPRIATE; AND (5) ANY PERTINENT POLICY STATEMENT ISSUED BY THE U.S. SENTENCING COMMISSION.**

---

Projected Release Date: 07-03-2027
Projected Release Method: GCT REL
FSA Projected Release Date: 07-03-2026
FSA Projected Release Method: FSA REL
FSA Conditional Release Date: 07-03-2026
SCA Conditional Placement Days: 0*
SCA Conditional Placement Date: N/A*
FSA Conditional Placement Days: 730
FSA Conditional Placement Date: 07-03-2024
Conditional Transition To Community Date: 07-03-2024*

***Default SCA conditional placement days. This requires a five-factor review!**

**Appellant's Addendum 33**

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



tion, see section 235(a)(1) of Pub. L. 98–473, set out as a note under section 3551 of this title.

**§ 3624. Release of a prisoner**

(a) DATE OF RELEASE.—A prisoner shall be released by the Bureau of Prisons on the date of the expiration of the prisoner's term of imprisonment, less any time credited toward the service of the prisoner's sentence as provided in subsection (b). If the date for a prisoner's release falls on a Saturday, a Sunday, or a legal holiday at the place of confinement, the prisoner may be released by the Bureau on the last preceding weekday.

(b) CREDIT TOWARD SERVICE OF SENTENCE FOR SATISFACTORY BEHAVIOR.—(1) Subject to paragraph (2), a prisoner who is serving a term of imprisonment of more than 1 year[1] other than a term of imprisonment for the duration of the prisoner's life, may receive credit toward the service of the prisoner's sentence of up to 54 days for each year of the prisoner's sentence imposed by the court, subject to determination by the Bureau of Prisons that, during that year, the prisoner has displayed exemplary compliance with institutional disciplinary regulations. Subject to paragraph (2), if the Bureau determines that, during that year, the prisoner has not satisfactorily complied with such institutional regulations, the prisoner shall receive no such credit toward service of the prisoner's sentence or shall receive such lesser credit as the Bureau determines to be appropriate. In awarding credit under this section, the Bureau shall consider whether the prisoner, during the relevant period, has earned, or is making satisfactory progress toward earning, a high school diploma or an equivalent degree. Credit that has not been earned may not later be granted. Subject to paragraph (2), credit for the last year of a term of imprisonment shall be credited on the first day of the last year of the term of imprisonment.

(2) Notwithstanding any other law, credit awarded under this subsection after the date of enactment of the Prison Litigation Reform Act shall vest on the date the prisoner is released from custody.

(3) The Attorney General shall ensure that the Bureau of Prisons has in effect an optional General Educational Development program for inmates who have not earned a high school diploma or its equivalent.

(4) Exemptions to the General Educational Development requirement may be made as deemed appropriate by the Director of the Federal Bureau of Prisons.

(c) PRERELEASE CUSTODY.—

(1) IN GENERAL.—The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility.

(2) HOME CONFINEMENT AUTHORITY.—The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months. The Bureau of Prisons shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph.

(3) ASSISTANCE.—The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during prerelease custody under this subsection.

(4) NO LIMITATIONS.—Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621.

(5) REPORTING.—Not later than 1 year after the date of the enactment of the Second Chance Act of 2007 (and every year thereafter), the Director of the Bureau of Prisons shall transmit to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives a report describing the Bureau's utilization of community corrections facilities. Each report under this paragraph shall set forth the number and percentage of Federal prisoners placed in community corrections facilities during the preceding year, the average length of such placements, trends in such utilization, the reasons some prisoners are not placed in community corrections facilities, and number of prisoners not being placed in community corrections facilities for each reason set forth, and any other information that may be useful to the committees in determining if the Bureau is utilizing community corrections facilities in an effective manner.

(6) ISSUANCE OF REGULATIONS.—The Director of the Bureau of Prisons shall issue regulations pursuant to this subsection not later than 90 days after the date of the enactment of the Second Chance Reauthorization Act of 2018, which shall ensure that placement in a community correctional facility by the Bureau of Prisons is—

(A) conducted in a manner consistent with section 3621(b) of this title;

(B) determined on an individual basis; and

(C) of sufficient duration to provide the greatest likelihood of successful reintegration into the community.

(d) ALLOTMENT OF CLOTHING, FUNDS, AND TRANSPORTATION.—Upon the release of a prisoner on the expiration of the prisoner's term of imprisonment, the Bureau of Prisons shall furnish the prisoner with—

(1) suitable clothing;

(2) an amount of money, not more than $500, determined by the Director to be consistent with the needs of the offender and the public interest, unless the Director determines that the financial position of the offender is such that no sum should be furnished; and

(3) transportation to the place of the prisoner's conviction, to the prisoner's bona fide residence within the United States, or to such other place within the United States as may be authorized by the Director.

(e) SUPERVISION AFTER RELEASE.—A prisoner whose sentence includes a term of supervised re-

[1] So in original. Probably should be followed by a comma.

lease after imprisonment shall be released by the Bureau of Prisons to the supervision of a probation officer who shall, during the term imposed, supervise the person released to the degree warranted by the conditions specified by the sentencing court. The term of supervised release commences on the day the person is released from imprisonment and runs concurrently with any Federal, State, or local term of probation or supervised release or parole for another offense to which the person is subject or becomes subject during the term of supervised release. A term of supervised release does not run during any period in which the person is imprisoned in connection with a conviction for a Federal, State, or local crime unless the imprisonment is for a period of less than 30 consecutive days. Upon the release of a prisoner by the Bureau of Prisons to supervised release, the Bureau of Prisons shall notify such prisoner, verbally and in writing, of the requirement that the prisoner adhere to an installment schedule, not to exceed 2 years except in special circumstances, to pay for any fine imposed for the offense committed by such prisoner, and of the consequences of failure to pay such fines under sections 3611 through 3614 of this title.

(f) MANDATORY FUNCTIONAL LITERACY REQUIREMENT.—

(1) The Attorney General shall direct the Bureau of Prisons to have in effect a mandatory functional literacy program for all mentally capable inmates who are not functionally literate in each Federal correctional institution within 6 months from the date of the enactment of this Act.

(2) Each mandatory functional literacy program shall include a requirement that each inmate participate in such program for a mandatory period sufficient to provide the inmate with an adequate opportunity to achieve functional literacy, and appropriate incentives which lead to successful completion of such programs shall be developed and implemented.

(3) As used in this section, the term "functional literacy" means—

(A) an eighth grade equivalence in reading and mathematics on a nationally recognized standardized test;

(B) functional competency or literacy on a nationally recognized criterion-referenced test; or

(C) a combination of subparagraphs (A) and (B).

(4) Non-English speaking inmates shall be required to participate in an English-As-A-Second-Language program until they function at the equivalence of the eighth grade on a nationally recognized educational achievement test.

(5) The Chief Executive Officer of each institution shall have authority to grant waivers for good cause as determined and documented on an individual basis.

(g) PRERELEASE CUSTODY OR SUPERVISED RELEASE FOR RISK AND NEEDS ASSESSMENT SYSTEM PARTICIPANTS.—

(1) ELIGIBLE PRISONERS.—This subsection applies in the case of a prisoner (as such term is defined in section 3635) who—

(A) has earned time credits under the risk and needs assessment system developed under subchapter D (referred to in this subsection as the "System") in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment;

(B) has shown through the periodic risk reassessments a demonstrated recidivism risk reduction or has maintained a minimum or low recidivism risk, during the prisoner's term of imprisonment;

(C) has had the remainder of the prisoner's imposed term of imprisonment computed under applicable law; and

(D)(i) in the case of a prisoner being placed in prerelease custody, the prisoner—

(I) has been determined under the System to be a minimum or low risk to recidivate pursuant to the last 2 reassessments of the prisoner; or

(II) has had a petition to be transferred to prerelease custody or supervised release approved by the warden of the prison, after the warden's determination that—

(aa) the prisoner would not be a danger to society if transferred to prerelease custody or supervised release;

(bb) the prisoner has made a good faith effort to lower their recidivism risk through participation in recidivism reduction programs or productive activities; and

(cc) the prisoner is unlikely to recidivate; or

(ii) in the case of a prisoner being placed in supervised release, the prisoner has been determined under the System to be a minimum or low risk to recidivate pursuant to the last reassessment of the prisoner.

(2) TYPES OF PRERELEASE CUSTODY.—A prisoner shall be placed in prerelease custody as follows:

(A) HOME CONFINEMENT.—

(i) IN GENERAL.—A prisoner placed in prerelease custody pursuant to this subsection who is placed in home confinement shall—

(I) be subject to 24-hour electronic monitoring that enables the prompt identification of the prisoner, location, and time, in the case of any violation of subclause (II);

(II) remain in the prisoner's residence, except that the prisoner may leave the prisoner's home in order to, subject to the approval of the Director of the Bureau of Prisons—

(aa) perform a job or job-related activities, including an apprenticeship, or participate in job-seeking activities;

(bb) participate in evidence-based recidivism reduction programming or productive activities assigned by the System, or similar activities;

(cc) perform community service;

(dd) participate in crime victim restoration activities;

(ee) receive medical treatment;

(ff) attend religious activities; or

(gg) participate in other family-related activities that facilitate the pris-

oner's successful reentry such as a family funeral, a family wedding, or to visit a family member who is seriously ill; and

(III) comply with such other conditions as the Director determines appropriate.

(ii) ALTERNATE MEANS OF MONITORING.—If the electronic monitoring of a prisoner described in clause (i)(I) is infeasible for technical or religious reasons, the Director of the Bureau of Prisons may use alternative means of monitoring a prisoner placed in home confinement that the Director determines are as effective or more effective than the electronic monitoring described in clause (i)(I).

(iii) MODIFICATIONS.—The Director of the Bureau of Prisons may modify the conditions described in clause (i) if the Director determines that a compelling reason exists to do so, and that the prisoner has demonstrated exemplary compliance with such conditions.

(iv) DURATION.—Except as provided in paragraph (4), a prisoner who is placed in home confinement shall remain in home confinement until the prisoner has served not less than 85 percent of the prisoner's imposed term of imprisonment.

(B) RESIDENTIAL REENTRY CENTER.—A prisoner placed in prerelease custody pursuant to this subsection who is placed at a residential reentry center shall be subject to such conditions as the Director of the Bureau of Prisons determines appropriate.

(3) SUPERVISED RELEASE.—If the sentencing court included as a part of the prisoner's sentence a requirement that the prisoner be placed on a term of supervised release after imprisonment pursuant to section 3583, the Director of the Bureau of Prisons may transfer the prisoner to begin any such term of supervised release at an earlier date, not to exceed 12 months, based on the application of time credits under section 3632.

(4) DETERMINATION OF CONDITIONS.—In determining appropriate conditions for prisoners placed in prerelease custody pursuant to this subsection, the Director of the Bureau of Prisons shall, to the extent practicable, provide that increasingly less restrictive conditions shall be imposed on prisoners who demonstrate continued compliance with the conditions of such prerelease custody, so as to most effectively prepare such prisoners for reentry.

(5) VIOLATIONS OF CONDITIONS.—If a prisoner violates a condition of the prisoner's prerelease custody, the Director of the Bureau of Prisons may impose such additional conditions on the prisoner's prerelease custody as the Director of the Bureau of Prisons determines appropriate, or revoke the prisoner's prerelease custody and require the prisoner to serve the remainder of the term of imprisonment to which the prisoner was sentenced, or any portion thereof, in prison. If the violation is nontechnical in nature, the Director of the Bureau of Prisons shall revoke the prisoner's prerelease custody.

(6) ISSUANCE OF GUIDELINES.—The Attorney General, in consultation with the Assistant Director for the Office of Probation and Pretrial Services, shall issue guidelines for use by the Bureau of Prisons in determining—

(A) the appropriate type of prerelease custody or supervised release and level of supervision for a prisoner placed on prerelease custody pursuant to this subsection; and

(B) consequences for a violation of a condition of such prerelease custody by such a prisoner, including a return to prison and a reassessment of evidence-based recidivism risk level under the System.

(7) AGREEMENTS WITH UNITED STATES PROBATION AND PRETRIAL SERVICES.—The Director of the Bureau of Prisons shall, to the greatest extent practicable, enter into agreements with United States Probation and Pretrial Services to supervise prisoners placed in home confinement under this subsection. Such agreements shall—

(A) authorize United States Probation and Pretrial Services to exercise the authority granted to the Director pursuant to paragraphs (3) and (4); and

(B) take into account the resource requirements of United States Probation and Pretrial Services as a result of the transfer of Bureau of Prisons prisoners to prerelease custody or supervised release.

(8) ASSISTANCE.—United States Probation and Pretrial Services shall, to the greatest extent practicable, offer assistance to any prisoner not under its supervision during prerelease custody under this subsection.

(9) MENTORING, REENTRY, AND SPIRITUAL SERVICES.—Any prerelease custody into which a prisoner is placed under this subsection may not include a condition prohibiting the prisoner from receiving mentoring, reentry, or spiritual services from a person who provided such services to the prisoner while the prisoner was incarcerated, except that the warden of the facility at which the prisoner was incarcerated may waive the requirement under this paragraph if the warden finds that the provision of such services would pose a significant security risk to the prisoner, persons who provide such services, or any other person. The warden shall provide written notice of any such waiver to the person providing such services and to the prisoner.

(10) TIME LIMITS INAPPLICABLE.—The time limits under subsections (b) and (c) shall not apply to prerelease custody under this subsection.

(11) PRERELEASE CUSTODY CAPACITY.—The Director of the Bureau of Prisons shall ensure there is sufficient prerelease custody capacity to accommodate all eligible prisoners.

(Added Pub. L. 98–473, title II, § 212(a)(2), Oct. 12, 1984, 98 Stat. 2008; amended Pub. L. 99–646, §§ 16(a), 17(a), Nov. 10, 1986, 100 Stat. 3595; Pub. L. 101–647, title XXIX, §§ 2902(a), 2904, Nov. 29, 1990, 104 Stat. 4913; Pub. L. 103–322, title II, §§ 20405, 20412, Sept. 13, 1994, 108 Stat. 1825, 1828; Pub. L. 104–66, title I, § 1091(c), Dec. 21, 1995, 109 Stat. 722; Pub. L. 104–134, title I, § 101[(a)] [title VIII, § 809(c)], Apr. 26, 1996, 110 Stat. 1321, 1321–76; re-

numbered title I, Pub. L. 104–140, § 1(a), May 2, 1996, 110 Stat. 1327; Pub. L. 110–177, title V, § 505, Jan. 7, 2008, 121 Stat. 2542; Pub. L. 110–199, title II, § 251(a), Apr. 9, 2008, 122 Stat. 692; Pub. L. 115–391, title I, § 102(b)(1), title V, § 504(c), title VI, § 602, Dec. 21, 2018, 132 Stat. 5210, 5233, 5238.)

**Editorial Notes**

REFERENCES IN TEXT

The date of enactment of the Prison Litigation Reform Act, referred to in subsec. (b)(2), probably means the date of enactment of the Prison Litigation Reform Act of 1995, section 101[(a)] [title VIII] of Pub. L. 104–134, which was approved Apr. 26, 1996.

The date of the enactment of the Second Chance Act of 2007, referred to in subsec. (c)(5), is the date of enactment of Pub. L. 110–199, which was approved Apr. 9, 2008.

The date of the enactment of the Second Chance Reauthorization Act of 2018, referred to in subsec. (c)(6), is the date of enactment of title V of Pub. L. 115–391, which was approved Dec. 21, 2018.

The date of the enactment of this Act, referred to in subsec. (f)(1), probably means the date of enactment of Pub. L. 101–647, which enacted subsec. (f) and was approved Nov. 29, 1990.

PRIOR PROVISIONS

For a prior section 3624, applicable to offenses committed prior to Nov. 1, 1987, see note set out preceding section 3601 of this title.

AMENDMENTS

2018—Subsec. (b)(1). Pub. L. 115–391, § 102(b)(1)(A), substituted ‘‘of up to 54 days for each year of the prisoner's sentence imposed by the court,’’ for ‘‘, beyond the time served, of up to 54 days at the end of each year of the prisoner's term of imprisonment, beginning at the end of the first year of the term,’’ and ‘‘credit for the last year of a term of imprisonment shall be credited on the first day of the last year of the term of imprisonment’’ for ‘‘credit for the last year or portion of a year of the term of imprisonment shall be prorated and credited within the last six weeks of the sentence’’.

Subsec. (c)(2). Pub. L. 115–391, § 602, inserted at end ‘‘The Bureau of Prisons shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph.’’

Subsec. (c)(5). Pub. L. 115–391, § 504(c)(1), inserted ‘‘, and number of prisoners not being placed in community corrections facilities for each reason set forth’’ before ‘‘, and any other information’’.

Subsec. (c)(6). Pub. L. 115–391, § 504(c)(2), substituted ‘‘the Second Chance Reauthorization Act of 2018’’ for ‘‘the Second Chance Act of 2007’’ in introductory provisions.

Subsec. (g). Pub. L. 115–391, § 102(b)(1)(B), added subsec. (g).

2008—Subsec. (c). Pub. L. 110–199 amended subsec. (c) generally. Prior to amendment, text read as follows: ‘‘The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's reentry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement. The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during such pre-release custody.’’

Subsec. (e). Pub. L. 110–177 substituted ‘‘Upon the release of a prisoner by the Bureau of Prisons to supervised release, the Bureau of Prisons shall notify such prisoner, verbally and in writing, of the requirement that the prisoner adhere to an installment schedule, not to exceed 2 years except in special circumstances, to pay for any fine imposed for the offense committed by such prisoner, and of the consequences of failure to pay such fines under sections 3611 through 3614 of this title.’’ for ‘‘No prisoner shall be released on supervision unless such prisoner agrees to adhere to an installment schedule, not to exceed two years except in special circumstances, to pay for any fine imposed for the offense committed by such prisoner.’’

1996—Subsec. (b)(1). Pub. L. 104–134, § 101[(a)] [title VIII, § 809(c)(1)(A)], struck out at beginning ‘‘A prisoner (other than a prisoner serving a sentence for a crime of violence) who is serving a term of imprisonment of more than one year, other than a term of imprisonment for the duration of the prisoner's life, shall receive credit toward the service of the prisoner's sentence, beyond the time served, of fifty-four days at the end of each year of the prisoner's term of imprisonment, beginning at the end of the first year of the term, unless the Bureau of Prisons determines that, during that year, the prisoner has not satisfactorily complied with such institutional disciplinary regulations as have been approved by the Attorney General and issued to the prisoner.’’

Pub. L. 104–134, § 101[(a)] [title VIII, § 809(c)(1)(B)], in second sentence substituted ‘‘Subject to paragraph (2), a prisoner’’ for ‘‘A prisoner’’, struck out ‘‘for a crime of violence,’’ after ‘‘1 year’’, and struck out ‘‘such’’ after ‘‘compliance with’’.

Pub. L. 104–134, § 101[(a)] [title VIII, § 809(c)(1)(C)], in third sentence substituted ‘‘Subject to paragraph (2), if the Bureau’’ for ‘‘If the Bureau’’.

Pub. L. 104–134, § 101[(a)] [title VIII, § 809(c)(1)(D)], in fourth sentence substituted ‘‘In awarding credit under this section, the Bureau shall consider whether the prisoner, during the relevant period, has earned, or is making satisfactory progress toward earning, a high school diploma or an equivalent degree.’’ for ‘‘The Bureau's determination shall be made within fifteen days after the end of each year of the sentence.’’

Pub. L. 104–134, § 101[(a)] [title VIII, § 809(c)(1)(E)], in sixth sentence substituted ‘‘Subject to paragraph (2), credit for the last’’ for ‘‘Credit for the last’’.

Subsec. (b)(2). Pub. L. 104–134, § 101[(a)] [title VIII, § 809(c)(2)], amended par. (2) generally. Prior to amendment, par. (2) read as follows: ‘‘Credit toward a prisoner's service of sentence shall not be vested unless the prisoner has earned or is making satisfactory progress toward a high school diploma or an equivalent degree.’’

1995—Subsec. (f)(6). Pub. L. 104–66 struck out par. (6) which read as follows: ‘‘A report shall be provided to Congress on an annual basis summarizing the results of this program, including the number of inmate participants, the number successfully completing the program, the number who do not successfully complete the program, and the reasons for failure to successfully complete the program.’’

1994—Subsec. (a). Pub. L. 103–322, § 20405(2), substituted ‘‘the prisoner's’’ for ‘‘his’’ after ‘‘the expiration of’’ and ‘‘toward the service of’’.

Subsec. (b). Pub. L. 103–322, § 20412(1), (2), designated existing provisions as par. (1), substituted ‘‘Credit that has not been earned may not later be granted.’’ for ‘‘Such credit toward service of sentence vests at the time that it is received. Credit that has vested may not later be withdrawn, and credit that has not been earned may not later be granted.’’, and added pars. (2) to (4).

Pub. L. 103–322, § 20405, inserted ‘‘(other than a prisoner serving a sentence for a crime of violence)’’ after ‘‘A prisoner’’ in first sentence, substituted ‘‘the prisoner’’ for ‘‘he’’ before ‘‘has not satisfactorily complied with’’ in first sentence and before ‘‘shall receive no such credit toward’’ in third sentence and ‘‘the prisoner's’’ for ‘‘his’’ wherever appearing in first and third sentences, and inserted after first sentence ‘‘A prisoner who is serving a term of imprisonment of more than 1 year for a crime of violence, other than a term of imprisonment for the duration of the prisoner's life, may receive credit toward the service of the prisoner's sentence, beyond the time served, of up to 54 days at the

end of each year of the prisoner's term of imprisonment, beginning at the end of the first year of the term, subject to determination by the Bureau of Prisons that, during that year, the prisoner has displayed exemplary compliance with such institutional disciplinary regulations.''

Subsec. (c). Pub. L. 103–322, § 20405(2), substituted ''the prisoner's re-entry'' for ''his re-entry''.

Subsec. (d). Pub. L. 103–322, § 20405(2), (3), substituted ''the prisoner'' for ''him'' in introductory provisions and ''the prisoner's'' for ''his'' wherever appearing in introductory provisions and par. (3).

1990—Subsec. (c). Pub. L. 101–647, § 2902(a), inserted after first sentence ''The authority provided by this subsection may be used to place a prisoner in home confinement.''

Subsec. (f). Pub. L. 101–647, § 2904, added subsec. (f).

1986—Subsec. (b). Pub. L. 99–646, § 16(a), substituted ''beginning at the end of'' for ''beginning after''.

Subsec. (e). Pub. L. 99–646, § 17(a), substituted ''imprisonment and runs concurrently'' for ''imprisonment. The term runs concurrently'' and ''supervised released. A term of supervised release does not run'' for ''supervised release, except that it does not run'', struck out '', other than during limited intervals as a condition of probation or supervised release,'' after ''person is imprisoned'', and inserted ''unless the imprisonment is for a period of less than 30 consecutive days'' before the period at end of third sentence.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 2018 AMENDMENT

Pub. L. 115–391, title I, § 102(b)(2), (3), Dec. 21, 2018, 132 Stat. 5213, provided that:

''(2) EFFECTIVE DATE.—The amendments made by this subsection [amending this section] shall take effect beginning on the date that the Attorney General completes and releases the risk and needs assessment system under subchapter D of chapter 229 of title 18, United States Code, as added by section 101(a) of this Act.

''(3) APPLICABILITY.—The amendments made by this subsection shall apply with respect to offenses committed before, on, or after the date of enactment of this Act [Dec. 21, 2018], except that such amendments shall not apply with respect to offenses committed before November 1, 1987.''

EFFECTIVE DATE OF 1990 AMENDMENT

Pub. L. 101–647, title XXIX, § 2902(b), Nov. 29, 1990, 104 Stat. 4913, provided that: ''Section 3624(c) of title 18, United States Code, as amended by this section, shall apply with respect to all inmates, regardless of the date of their offense.''

EFFECTIVE DATE OF 1986 AMENDMENT

Pub. L. 99–646, § 16(b), Nov. 10, 1986, 100 Stat. 3595, provided that: ''The amendment made by this section [amending this section] shall take effect on the date of the taking effect of such section 3624 [Nov. 1, 1987].''

Pub. L. 99–646, § 17(b), Nov. 10, 1986, 100 Stat. 3595, provided that: ''The amendment made by this section [amending this section] shall take effect on the date of the taking effect of such section 3624 [Nov. 1, 1987].''

EFFECTIVE DATE

Section effective Nov. 1, 1987, and applicable only to offenses committed after the taking effect of this section, see section 235(a)(1) of Pub. L. 98–473, set out as a note under section 3551 of this title.

CONSTRUCTION OF 2008 AMENDMENT

For construction of amendments by Pub. L. 110–199 and requirements for grants made under such amendments, see section 60504 of Title 34, Crime Control and Law Enforcement.

REENTRY PLANNING AND SERVICES FOR INCARCERATED WOMEN

Pub. L. 117–103, div. W, title X, § 1004, Mar. 15, 2022, 136 Stat. 918, provided that:

''(a) IN GENERAL.—The Attorney General, in coordination with the Director of the Office of Probation and Pretrial Services and the Director of the Bureau of Prisons (including the Women and Special Population Branch), shall collaborate on a model of gender responsive transition for incarcerated women, including the development of a national standard on prevention with respect to domestic and sexual violence.

''(b) REQUIRED CONSULTATION.—In developing the model required under subsection (a), the Attorney General shall consult with such experts within the Federal government (including the Office on Violence Against Women of the Department of Justice), within Indian Tribes (as defined in section 4 of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304)), within Native Hawaiian organizations (as defined in section 6207 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7517)), and in the victim service provider community (including sexual and domestic violence and homelessness, job training and job placement service providers) as are necessary to the completion of a comprehensive plan.

''(c) CONTENTS.—The model required under subsection (a) shall address, at a minimum—

''(1) the development by the Bureau of Prisons of a contract for gender collaborative services; and

''(2) identification by re-entry affairs coordinators and responsive planning for the needs of re-entering women with respect to—

''(A) housing, including risk of homelessness;

''(B) previous exposure to and risk for domestic and sexual violence;

''(C) the need for parenting classes, assistance securing childcare, or assistance in seeking or securing jobs that afford flexibility (as might be necessary in the re-entry, parenting or other contexts);

''(D) other support tailored to the needs of Indigenous women, including American Indian, Alaska Native, and Native Hawaiian women; and

''(E) the need to ensure a family-focused reentry, by—

''(i) including incarcerated mothers, their children, and their caregivers to create family reentry planning and programming; and

''(ii) informing reentry information to visiting families.''

[For definitions of terms used in section 1004 of div. W of Pub. L. 117–103, set out above, see section 12291 of Title 34, Crime Control and Law Enforcement, as made applicable by section 2(b) of div. W of Pub. L. 117–103, which is set out as a note under section 12291 of Title 34.]

## § 3625. Inapplicability of the Administrative Procedure Act

The provisions of sections 554 and 555 and 701 through 706 of title 5, United States Code, do not apply to the making of any determination, decision, or order under this subchapter.

(Added Pub. L. 98–473, title II, § 212(a)(2), Oct. 12, 1984, 98 Stat. 2010.)

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE

Section effective Nov. 1, 1987, and applicable only to offenses committed after the taking effect of this section, see section 235(a)(1) of Pub. L. 98–473, set out as a note under section 3551 of this title.

## § 3626. Appropriate remedies with respect to prison conditions

(a) REQUIREMENTS FOR RELIEF.—



Appellate Case: 25-3090 Page: 40 Date Filed: 12/02/2025 Entry ID: 5583451

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



mittee. The Independent Review Committee shall be established not later than 30 days after the date of enactment of this Act [Dec. 21, 2018].

''(c) APPOINTMENT OF INDEPENDENT REVIEW COMMITTEE.—The organization selected by the National Institute of Justice shall appoint not fewer than 6 members to the Independent Review Committee.

''(d) COMPOSITION OF THE INDEPENDENT REVIEW COMMITTEE.—The members of the Independent Review Committee shall all have expertise in risk and needs assessment systems and shall include—

''(1) 2 individuals who have published peer-reviewed scholarship about risk and needs assessments in both corrections and community settings;

''(2) 2 corrections practitioners who have developed and implemented a risk assessment tool in a corrections system or in a community supervision setting, including 1 with prior experience working within the Bureau of Prisons; and

''(3) 1 individual with expertise in assessing risk assessment implementation.

''(e) DUTIES OF THE INDEPENDENT REVIEW COMMITTEE.—The Independent Review Committee shall assist the Attorney General in carrying out the Attorney General's duties under sections 3631(b), 3632 and 3633 of title 18, United States Code, as added by section 101(a) of this Act, including by assisting in—

''(1) conducting a review of the existing prisoner risk and needs assessment systems in operation on the date of enactment of this Act;

''(2) developing recommendations regarding evidence-based recidivism reduction programs and productive activities;

''(3) conducting research and data analysis on—

''(A) evidence-based recidivism reduction programs relating to the use of prisoner risk and needs assessment tools;

''(B) the most effective and efficient uses of such programs; and

''(C) which evidence-based recidivism reduction programs are the most effective at reducing recidivism, and the type, amount, and intensity of programming that most effectively reduces the risk of recidivism; and

''(4) reviewing and validating the risk and needs assessment system.

''(f) BUREAU OF PRISONS COOPERATION.—The Director of the Bureau of Prisons shall assist the Independent Review Committee in performing the Committee's duties and promptly respond to requests from the Committee for access to Bureau of Prisons facilities, personnel, and information.

''(g) REPORT.—Not later than 2 years after the date of enactment of this Act, the Independent Review Committee shall submit to the Committee on the Judiciary and the Subcommittee on Commerce, Justice, Science, and Related Agencies of the Committee on Appropriations of the Senate and the Committee on the Judiciary and the Subcommittee on Commerce, Justice, Science, and Related Agencies of the Committee on Appropriations of the House of Representatives a report that includes—

''(1) a list of all offenses of conviction for which prisoners were ineligible to receive time credits under section 3632(d)(4)(D) of title 18, United States Code, as added by section 101(a) of this Act, and for each offense the number of prisoners excluded, including demographic percentages by age, race, and sex;

''(2) the criminal history categories of prisoners ineligible to receive time credits under section 3632(d)(4)(D) of title 18, United States Code, as added by section 101(a) of this Act, and for each category the number of prisoners excluded, including demographic percentages by age, race, and sex;

''(3) the number of prisoners ineligible to apply time credits under section 3632(d)(4)(D) of title 18, United States Code, as added by section 101(a) of this Act, who do not participate in recidivism reduction programming or productive activities, including the demographic percentages by age, race, and sex;

''(4) any recommendations for modifications to section 3632(d)(4)(D) of title 18, United States Code, as added by section 101(a) of this Act, and any other recommendations regarding recidivism reduction.

''(h) TERMINATION.—The Independent Review Committee shall terminate on the date that is 2 years after the date on which the risk and needs assessment system authorized by sections 3632 and 3633 of title 18, United States Code, as added by section 101(a) of this Act, is released.''

### § 3632. Development of risk and needs assessment system

(a) IN GENERAL.—Not later than 210 days after the date of enactment of this subchapter, the Attorney General, in consultation with the Independent Review Committee authorized by the First Step Act of 2018, shall develop and release publicly on the Department of Justice website a risk and needs assessment system (referred to in this subchapter as the ''System''), which shall be used to—

(1) determine the recidivism risk of each prisoner as part of the intake process, and classify each prisoner as having minimum, low, medium, or high risk for recidivism;

(2) assess and determine, to the extent practicable, the risk of violent or serious misconduct of each prisoner;

(3) determine the type and amount of evidence-based recidivism reduction programming that is appropriate for each prisoner and assign each prisoner to such programming accordingly, and based on the prisoner's specific criminogenic needs, and in accordance with subsection (b);

(4) reassess the recidivism risk of each prisoner periodically, based on factors including indicators of progress, and of regression, that are dynamic and that can reasonably be expected to change while in prison;

(5) reassign the prisoner to appropriate evidence-based recidivism reduction programs or productive activities based on the revised determination to ensure that—

(A) all prisoners at each risk level have a meaningful opportunity to reduce their classification during the period of incarceration;

(B) to address[1] the specific criminogenic needs of the prisoner; and

(C) all prisoners are able to successfully participate in such programs;

(6) determine when to provide incentives and rewards for successful participation in evidence-based recidivism reduction programs or productive activities in accordance with subsection (e);

(7) determine when a prisoner is ready to transfer into prerelease custody or supervised release in accordance with section 3624; and

(8) determine the appropriate use of audio technology for program course materials with an understanding of dyslexia.

In carrying out this subsection, the Attorney General may use existing risk and needs assessment tools, as appropriate.

(b) ASSIGNMENT OF EVIDENCE-BASED RECIDIVISM REDUCTION PROGRAMS.—The System shall provide guidance on the type, amount, and inten-

[1] So in original.

Appellant's Addendum 39

sity of evidence-based recidivism reduction programming and productive activities that shall be assigned for each prisoner, including—

(1) programs in which the Bureau of Prisons shall assign the prisoner to participate, according to the prisoner's specific criminogenic needs; and

(2) information on the best ways that the Bureau of Prisons can tailor the programs to the specific criminogenic needs of each prisoner so as to most effectively lower each prisoner's risk of recidivism.

(c) HOUSING AND ASSIGNMENT DECISIONS.—The System shall provide guidance on program grouping and housing assignment determinations and, after accounting for the safety of each prisoner and other individuals at the prison, provide that prisoners with a similar risk level be grouped together in housing and assignment decisions to the extent practicable.

(d) EVIDENCE-BASED RECIDIVISM REDUCTION PROGRAM INCENTIVES AND PRODUCTIVE ACTIVITIES REWARDS.—The System shall provide incentives and rewards for prisoners to participate in and complete evidence-based recidivism reduction programs as follows:

(1) PHONE AND VISITATION PRIVILEGES.—A prisoner who is successfully participating in an evidence-based recidivism reduction program shall receive—

(A) phone privileges, or, if available, video conferencing privileges, for up to 30 minutes per day, and up to 510 minutes per month; and

(B) additional time for visitation at the prison, as determined by the warden of the prison.

(2) TRANSFER TO INSTITUTION CLOSER TO RELEASE RESIDENCE.—A prisoner who is successfully participating in an evidence-based recidivism reduction program shall be considered by the Bureau of Prisons for placement in a facility closer to the prisoner's release residence upon request from the prisoner and subject to—

(A) bed availability at the transfer facility;

(B) the prisoner's security designation; and

(C) the recommendation from the warden of the prison at which the prisoner is incarcerated at the time of making the request.

(3) ADDITIONAL POLICIES.—The Director of the Bureau of Prisons shall develop additional policies to provide appropriate incentives for successful participation and completion of evidence-based recidivism reduction programming. The incentives shall include not less than 2 of the following:

(A) Increased commissary spending limits and product offerings.

(B) Extended opportunities to access the email system.

(C) Consideration of transfer to preferred housing units (including transfer to different prison facilities).

(D) Other incentives solicited from prisoners and determined appropriate by the Director.

(4) TIME CREDITS.—

(A) IN GENERAL.—A prisoner, except for an ineligible prisoner under subparagraph (D), who successfully completes evidence-based recidivism reduction programming or productive activities, shall earn time credits as follows:

(i) A prisoner shall earn 10 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities.

(ii) A prisoner determined by the Bureau of Prisons to be at a minimum or low risk for recidivating, who, over 2 consecutive assessments, has not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities.

(B) AVAILABILITY.—A prisoner may not earn time credits under this paragraph for an evidence-based recidivism reduction program that the prisoner successfully completed—

(i) prior to the date of enactment of this subchapter; or

(ii) during official detention prior to the date that the prisoner's sentence commences under section 3585(a).

(C) APPLICATION OF TIME CREDITS TOWARD PRERELEASE CUSTODY OR SUPERVISED RELEASE.—Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities shall be applied toward time in prerelease custody or supervised release. The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release.

(D) INELIGIBLE PRISONERS.—A prisoner is ineligible to receive time credits under this paragraph if the prisoner is serving a sentence for a conviction under any of the following provisions of law:

(i) Section 32, relating to destruction of aircraft or aircraft facilities.

(ii) Section 33, relating to destruction of motor vehicles or motor vehicle facilities.

(iii) Section 36, relating to drive-by shootings.

(iv) Section 81, relating to arson within special maritime and territorial jurisdiction.

(v) Section 111(b), relating to assaulting, resisting, or impeding certain officers or employees using a deadly or dangerous weapon or inflicting bodily injury.

(vi) Paragraph (1), (7), or (8) of section 113(a), relating to assault with intent to commit murder, assault resulting in substantial bodily injury to a spouse or intimate partner, a dating partner, or an individual who has not attained the age of 16 years, or assault of a spouse, intimate partner, or dating partner by strangling, suffocating, or attempting to strangle or suffocate.

(vii) Section 115, relating to influencing, impeding, or retaliating against a Federal

Appellant's Addendum 40

official by injuring a family member, except for a threat made in violation of that section.

(viii) Section 116, relating to female genital mutilation.

(ix) Section 117, relating to domestic assault by a habitual offender.

(x) Any section of chapter 10, relating to biological weapons.

(xi) Any section of chapter 11B, relating to chemical weapons.

(xii) Section 351, relating to Congressional, Cabinet, and Supreme Court assassination, kidnapping, and assault.

(xiii) Section 521, relating to criminal street gangs.

(xiv) Section 751, relating to prisoners in custody of an institution or officer.

(xv) Section 793, relating to gathering, transmitting, or losing defense information.

(xvi) Section 794, relating to gathering or delivering defense information to aid a foreign government.

(xvii) Any section of chapter 39, relating to explosives and other dangerous articles, except for section 836 (relating to the transportation of fireworks into a State prohibiting sale or use).

(xviii) Section 842(p), relating to distribution of information relating to explosives, destructive devices, and weapons of mass destruction, but only if the conviction involved a weapon of mass destruction (as defined in section 2332a(c)).

(xix) Subsection (f)(3), (h), or (i) of section 844, relating to the use of fire or an explosive.

(xx) Section 871, relating to threats against the President and successors to the Presidency.

(xxi) Section 879, relating to threats against former Presidents and certain other persons.

(xxii) Section 924(c), relating to unlawful possession or use of a firearm during and in relation to any crime of violence or drug trafficking crime.

(xxiii) Section 1030(a)(1), relating to fraud and related activity in connection with computers.

(xxiv) Section 1091, relating to genocide.

(xxv) Any section of chapter 51, relating to homicide, except for section 1112 (relating to manslaughter), 1113 (relating to attempt to commit murder or manslaughter, but only if the conviction was for an attempt to commit manslaughter), 1115 (relating to misconduct or neglect of ship officers), or 1122 (relating to protection against the human immunodeficiency virus).

(xxvi) Any section of chapter 55, relating to kidnapping.

(xxvii) Any offense under chapter 77, relating to peonage, slavery, and trafficking in persons, except for sections 1593 through 1596.

(xxviii) Section 1751, relating to Presidential and Presidential staff assassination, kidnapping, and assault.

(xxix) Section 1791, relating to providing or possessing contraband in prison.

(xxx) Section 1792, relating to mutiny and riots.

(xxxi) Section 1841(a)(2)(C), relating to intentionally killing or attempting to kill an unborn child.

(xxxii) Section 1992, relating to terrorist attacks and other violence against railroad carriers and against mass transportation systems on land, on water, or through the air.

(xxxiii) Section 2113(e), relating to bank robbery resulting in death.

(xxxiv) Section 2118(c), relating to robberies and burglaries involving controlled substances resulting in assault, putting in jeopardy the life of any person by the use of a dangerous weapon or device, or death.

(xxxv) Section 2119, relating to taking a motor vehicle (commonly referred to as ''carjacking'').

(xxxvi) Any section of chapter 105, relating to sabotage, except for section 2152.

(xxxvii) Any section of chapter 109A, relating to sexual abuse.

(xxxviii) Section 2250, relating to failure to register as a sex offender.

(xxxix) Section 2251, relating to the sexual exploitation of children.

(xl) Section 2251A, relating to the selling or buying of children.

(xli) Section 2252, relating to certain activities relating to material involving the sexual exploitation of minors.

(xlii) Section 2252A, relating to certain activities involving material constituting or containing child pornography.

(xliii) Section 2260, relating to the production of sexually explicit depictions of a minor for importation into the United States.

(xliv) Section 2283, relating to the transportation of explosive, biological, chemical, or radioactive or nuclear materials.

(xlv) Section 2284, relating to the transportation of terrorists.

(xlvi) Section 2291, relating to the destruction of a vessel or maritime facility, but only if the conduct that led to the conviction involved a substantial risk of death or serious bodily injury.

(xlvii) Any section of chapter 113B, relating to terrorism.

(xlviii) Section 2340A, relating to torture.

(xlix) Section 2381, relating to treason.

(l) Section 2442, relating to the recruitment or use of child soldiers.

(li) An offense described in section 3559(c)(2)(F), for which the offender was sentenced to a term of imprisonment of more than 1 year, if the offender has a previous conviction, for which the offender served a term of imprisonment of more than 1 year, for a Federal or State offense, by whatever designation and wherever committed, consisting of murder (as described in section 1111), voluntary manslaughter (as described in section 1112), assault with intent to commit murder (as de-

scribed in section 113(a)), aggravated sexual abuse and sexual abuse (as described in sections 2241 and 2242), abusive sexual contact (as described in sections 2244(a)(1) and (a)(2)), kidnapping (as described in chapter 55), carjacking (as described in section 2119), arson (as described in section 844(f)(3), (h), or (i)), or terrorism (as described in chapter 113B).

(lii) Section 57(b) of the Atomic Energy Act of 1954 (42 U.S.C. 2077(b)), relating to the engagement or participation in the development or production of special nuclear material.

(liii) Section 92 of the Atomic Energy Act of 1954 (42 U.S.C. 2122), relating to prohibitions governing atomic weapons.

(liv) Section 101 of the Atomic Energy Act of 1954 (42 U.S.C. 2131), relating to the atomic energy license requirement.

(lv) Section 224 or 225 of the Atomic Energy Act of 1954 (42 U.S.C. 2274, 2275), relating to the communication or receipt of restricted data.

(lvi) Section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), relating to the sabotage of nuclear facilities or fuel.

(lvii) Section 60123(b) of title 49, relating to damaging or destroying a pipeline facility, but only if the conduct which led to the conviction involved a substantial risk of death or serious bodily injury.

(lviii) Section 401(a) of the Controlled Substances Act (21 U.S.C. 841), relating to manufacturing or distributing a controlled substance in the case of a conviction for an offense described in subparagraph (A), (B), or (C) of subsection (b)(1) of that section for which death or serious bodily injury resulted from the use of such substance.

(lix) Section 276(a) of the Immigration and Nationality Act (8 U.S.C. 1326), relating to the reentry of a removed alien, but only if the alien is described in paragraph (1) or (2) of subsection (b) of that section.

(lx) Section 277 of the Immigration and Nationality Act (8 U.S.C. 1327), relating to aiding or assisting certain aliens to enter the United States.

(lxi) Section 278 of the Immigration and Nationality Act (8 U.S.C. 1328), relating to the importation of an alien into the United States for an immoral purpose.

(lxii) Any section of the Export Administration Act of 1979 (50 U.S.C. 4611 et seq.)[2]

(lxiii) Section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705).

(lxiv) Section 601 of the National Security Act of 1947 (50 U.S.C. 3121), relating to the protection of identities of certain United States undercover intelligence officers, agents, informants, and sources.

(lxv) Subparagraph (A)(i) or (B)(i) of section 401(b)(1) of the Controlled Substances Act (21 U.S.C. 841(b)(1)) or paragraph (1)(A) or (2)(A) of section 1010(b) of the Controlled Substances Import and Export Act (21 U.S.C. 960(b)), relating to manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute, dispense, or knowingly importing or exporting, a mixture or substance containing a detectable amount of heroin if the sentencing court finds that the offender was an organizer, leader, manager, or supervisor of others in the offense, as determined under the guidelines promulgated by the United States Sentencing Commission.

(lxvi) Subparagraph (A)(vi) or (B)(vi) of section 401(b)(1) of the Controlled Substances Act (21 U.S.C. 841(b)(1)) or paragraph (1)(F) or (2)(F) of section 1010(b) of the Controlled Substances Import and Export Act (21 U.S.C. 960(b)), relating to manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute, or dispense, a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, or any analogue thereof.

(lxvii) Subparagraph (A)(viii) or (B)(viii) of section 401(b)(1) of the Controlled Substances Act (21 U.S.C. 841(b)(1)) or paragraph (1)(H) or (2)(H) of section 1010(b) the Controlled Substances Import and Export Act (21 U.S.C. 960(b)), relating to manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute, or dispense, or knowingly importing or exporting, a mixture of substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, if the sentencing court finds that the offender was an organizer, leader, manager, or supervisor of others in the offense, as determined under the guidelines promulgated by the United States Sentencing Commission.

(lxviii) Subparagraph (A) or (B) of section 401(b)(1) of the Controlled Substances Act (21 U.S.C. 841(b)(1)) or paragraph (1) or (2) of section 1010(b) of the Controlled Substances Import and Export Act (21 U.S.C. 960(b)), relating to manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute, or dispense, a controlled substance, or knowingly importing or exporting a controlled substance, if the sentencing court finds that—

(I) the offense involved a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, or any analogue thereof; and

(II) the offender was an organizer, leader, manager, or supervisor of others in the offense, as determined under the guidelines promulgated by the United States Sentencing Commission.

(E) DEPORTABLE PRISONERS INELIGIBLE TO APPLY TIME CREDITS.—

(i) IN GENERAL.—A prisoner is ineligible to apply time credits under subparagraph (C) if the prisoner is the subject of a final order of removal under any provision of the immigration laws (as such term is de-

[2] So in original. Probably should be followed by a period.



Appellate Case: 25-3090 Page: 44 Date Filed: 12/02/2025 Entry ID: 5583451

fined in section 101(a)(17) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(17))).

(ii) PROCEEDINGS.—The Attorney General, in consultation with the Secretary of Homeland Security, shall ensure that any alien described in section 212 or 237 of the Immigration and Nationality Act (8 U.S.C. 1182, 1227) who seeks to earn time credits are subject to proceedings described in section 238(a) of that Act (8 U.S.C. 1228(a)) at a date as early as practicable during the prisoner's incarceration.

(5) RISK REASSESSMENTS AND LEVEL ADJUSTMENT.—A prisoner who successfully participates in evidence-based recidivism reduction programming or productive activities shall receive periodic risk reassessments not less often than annually, and a prisoner determined to be at a medium or high risk of recidivating and who has less than 5 years until his or her projected release date shall receive more frequent risk reassessments. If the reassessment shows that the prisoner's risk of recidivating or specific needs have changed, the Bureau of Prisons shall update the determination of the prisoner's risk of recidivating or information regarding the prisoner's specific needs and reassign the prisoner to appropriate evidence-based recidivism reduction programming or productive activities based on such changes.

(6) RELATION TO OTHER INCENTIVE PROGRAMS.—The incentives described in this subsection shall be in addition to any other rewards or incentives for which a prisoner may be eligible.

(e) PENALTIES.—The Director of the Bureau of Prisons shall develop guidelines for the reduction of rewards and incentives earned under subsection (d) for prisoners who violate prison rules or evidence-based recidivism reduction program or productive activity rules, which shall provide—

(1) general levels of violations and resulting reductions;

(2) that any reduction that includes the loss of time credits shall require written notice to the prisoner, shall be limited to time credits that a prisoner earned as of the date of the prisoner's rule violation, and shall not include any future time credits that the prisoner may earn; and

(3) for a procedure to restore time credits that a prisoner lost as a result of a rule violation, based on the prisoner's individual progress after the date of the rule violation.

(f) BUREAU OF PRISONS TRAINING.—The Attorney General shall develop and implement training programs for Bureau of Prisons officers and employees responsible for administering the System, which shall include—

(1) initial training to educate officers and employees on how to use the System in an appropriate and consistent manner, as well as the reasons for using the System;

(2) continuing education;

(3) periodic training updates; and

(4) a requirement that such officers and employees demonstrate competence in administering the System, including interrater reliability, on a biannual basis.

(g) QUALITY ASSURANCE.—In order to ensure that the Bureau of Prisons is using the System in an appropriate and consistent manner, the Attorney General shall monitor and assess the use of the System, which shall include conducting annual audits of the Bureau of Prisons regarding the use of the System.

(h) DYSLEXIA SCREENING.—

(1) SCREENING.—The Attorney General shall incorporate a dyslexia screening program into the System, including by screening for dyslexia during—

(A) the intake process; and

(B) each periodic risk reassessment of a prisoner.

(2) TREATMENT.—The Attorney General shall incorporate programs designed to treat dyslexia into the evidence-based recidivism reduction programs or productive activities required to be implemented under this section. The Attorney General may also incorporate programs designed to treat other learning disabilities.

(Added Pub. L. 115–391, title I, §101(a), Dec. 21, 2018, 132 Stat. 5196.)

**Editorial Notes**

REFERENCES IN TEXT

The date of enactment of this subchapter, referred to in subsecs. (a) and (d)(4)(B)(i), is the date of enactment of Pub. L. 115–391, which was approved Dec. 21, 2018.

The First Step Act of 2018, referred to in subsec. (a), is Pub. L. 115–391, Dec. 21, 2018, 132 Stat. 5194. For complete classification of this Act to the Code, see Short Title of 2018 Amendment note under section 1 of this title and Tables.

The Export Administration Act of 1979, referred to in subsec. (d)(4)(D)(lxii), is Pub. L. 96–72, Sept. 29, 1979, 93 Stat. 503, which was classified principally to chapter 56 (§4601 et seq.) of Title 50, War and National Defense, prior to repeal by Pub. L. 115–232, div. A, title XVII, §1766(a), Aug. 13, 2018, 132 Stat. 2232, except for sections 11A, 11B, and 11C thereof (50 U.S.C. 4611, 4612, 4613).

### § 3633. Evidence-based recidivism reduction program and recommendations

(a) IN GENERAL.—Prior to releasing the System, in consultation with the Independent Review Committee authorized by the First Step Act of 2018, the Attorney General shall—

(1) review the effectiveness of evidence-based recidivism reduction programs that exist as of the date of enactment of this subchapter in prisons operated by the Bureau of Prisons;

(2) review available information regarding the effectiveness of evidence-based recidivism reduction programs and productive activities that exist in State-operated prisons throughout the United States;

(3) identify the most effective evidence-based recidivism reduction programs;

(4) review the policies for entering into evidence-based recidivism reduction partnerships described in section 3621(h)(5); and

(5) direct the Bureau of Prisons regarding—

(A) evidence-based recidivism reduction programs;

(B) the ability for faith-based organizations to function as a provider of edu-

# CERTIFICATES OF SERVICE
# FOR DOCUMENTS FILED USING CM/ECF

**Certificate of Service When All Case Participants Are CM/ECF Participants**

I hereby certify that on December 1, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Trevor N. Parkes