25-3090

# United States Court of Appeals for the Eighth Circuit

JOSE OSORIO-CALDERON,

*Appellant,*

-v.-

WARDEN, FCI SANDSTONE,

*Appellee*

*On Appeal from the United States District Court for the District of Minnesota*

**BRIEF OF AMICUS CURIAE THE CLEMENCY PROJECT CLINIC OF THE UNIVERSITY OF MINNESOTA LAW SCHOOL IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL**

JANEANNE MURRAY
ATTORNEY ID: 0394887
Ellen Bart*
Annemarie Foy*
Kylie Lewis*
Bekah Muta*
Kate Reifenberg*
The Clemency Project Clinic
University of Minnesota Law School
229 19th Avenue South
Minneapolis, MN 55455
(612) 339-5160

**Student-Certified Attorneys in the State of Minnesota*

## Table of Contents

Table of Authorities ........................................ iii

Interest of Amicus Curiae ........................................ 1

Summary of Argument ........................................ 2

Argument ........................................ 3

I. The Legislative History of the First Step Act Makes Clear that Congress Intended that the Bureau of Prisons Transfer Eligible Prisoners to Pre-Release Custody or Supervised Release as Soon as they Become Eligible ........................................ 3

A. Congress Intended that the First Step Act Effectuate the Most Comprehensive Reform Possible, which Aligns with Mandating that Incarcerated Individuals Immediately Be Transferred Upon Eligibility ........................................ 4

B. The First Step Act Largely Focuses on Reducing Recidivism through Effective Programming for Incarcerated Individuals, and Participation in this Programming is Incentivized Only if Transfer Occurs As Required Under the First Step Act ........................................ 7

C. A Primary Goal of the First Step Act Was to Save Taxpayer Money and Dedicate Resources to More Effective Public Safety Programs, and Such Savings Can Only Be Achieved if Transfer Occurs Immediately Upon Eligibility ........................................ 11

II. Individuals Released Under the FSA Have Significantly Lower Levels of Recidivism than Similarly Situated Individuals Prior to the FSA ........................................ 15

A. Individuals Released Under the FSA Have Low Recidivism Rates ........................................ 16



Appellate Case: 25-3090 Page: 2 Date Filed: 12/12/2025 Entry ID: 5587699

B. Individuals Released Under the FSA Are Significantly Less Likely to Recidivate Compared to All People Released from BOP Facilities ........ 18

C. Individuals Released Under the FSA are Less Likely to Recidivate than Similarly Situated People Released Prior to the FSA ........ 19

D. When Distinguishing Between Recidivism Due to Technical Violations and New Criminal Activity, Recidivism of Individuals Released Under the FSA is Even Lower ........ 23

Conclusion ........ 26

Certificate of Compliance ........ 27

Certificate of Service ........ 28



Appellate Case: 25-3090 Page: 3 Date Filed: 12/12/2025 Entry ID: 5587699

## Table of Authorities

Cases

*North Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1982) .......... 4

*United States v. Dixon*, 546 F.Supp.2d 1198 (D. Kan. 2008) .......... 6

*United States v. Kimball*, 830 F.3d 747 (8th Cir. 2016) .......... 6

Statutes

18 U.S.C. § 3632 .......... 2, 5

18 U.S.C. § 3633 .......... 5, 8, 11

Legislative History

164 Cong. Rec. H4311 (daily ed. May 22, 2018) .......... 11

164 Cong. Rec. S7745 (daily ed. Dec. 18, 2018) .......... *passim*

164 Cong. Rec. H10430 (daily ed. Dec. 20, 2018) .......... 10

Other Authorities

*The Attorney General's First Step Act Section 3634 Annual Report*, OFF. ATT'Y GEN. (Dec. 2020) .......... 15

Avinash Bhati, *First Step Act: An Early Analysis of Recidivism*, COUNCIL ON CRIM. JUST. (Aug. 2023) .......... 16

Avinash Bhati, *First Step Act: An Early Analysis of Recidivism*, COUNCIL ON CRIM. JUST. (Dec. 2024) .......... 13

Avinash Bhati, *Technically Speaking: Accounting for Technical Violations*

*in First Step Act Recidivism*, COUNCIL ON CRIM. JUST. (Dec. 2023)............ 20

*First Step Act: An Early Analysis of Recidivism*, COUNCIL ON CRIM. JUST. ........... 14

*First Step Act Annual Report*, OFF. ATT'Y GEN. (Apr. 2022)................................. 15

*First Step Act Annual Report*, OFF. ATT'Y GEN. (Apr. 2023)................................. 15

*First Step Act Annual Report*, DEP'T JUSTICE (June 2024)..................................... 15

Monique O. Esitelu, *Equipping Individuals for Life Beyond Bars*, NEW AM. (Nov. 4, 2019)........................................................................................... 8

Raquel Wilson, *A Critical Assessment of the First Step Act's Recidivism-Reduction Measures*, 128 DICK. L. REV. 461, 480–81 (2024) ..................... 17



Appellate Case: 25-3090 Page: 5 Date Filed: 12/12/2025 Entry ID: 5587699

## Interest of Amicus Curiae

The Clemency Project Clinic of the University of Minnesota Law School (the "Clinic") represents long-term incarcerated individuals in connection with their judicial and administrative efforts to obtain reductions in their sentences. The majority of the Clinic's clients are federal prisoners serving decades-long sentences. The First Step Act marked one of the most significant federal criminal justice reforms in decades, expanding earned-time credits, reducing certain mandatory minimums, and creating meaningful pathways for early release. Its implementation has opened the door to fairer sentencing practices and given thousands of individuals a real chance at rehabilitation and a timely return to their families and communities. The Clinic has seen firsthand how First Step Act credits can transform our clients' outlook, bringing real optimism, hope and dedication. That experience drives our commitment to ensuring the Act is applied accurately and its earned-time credits awarded and implemented appropriately.[1]

[1] No party's counsel authored any part of this brief, and no party, party's counsel, or any person other than amicus contributed any money that was intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief. The views and arguments expressed in this brief are those of the authors of the brief alone. The contents of this brief have not been reviewed or approved by the University of Minnesota or the University of Minnesota Law School.



Appellate Case: 25-3090 Page: 6 Date Filed: 12/12/2025 Entry ID: 5587699

## Summary of Argument

Mr. Osorio-Calderon was eligible for transfer into prerelease custody under the First Step Act ("FSA") on July 3, 2024, but the Bureau of Prisons ("BOP") continues to hold him in custody, in direct violation of the FSA's mandate that eligible prisoners "*shall*" be transferred. 18 U.S.C. § 3632(d)(4)(C) (emphasis added). The FSA is clear: when the prisoner meets the requirements for pre-release custody under the FSA, the prisoner must be so transferred. *See* 18 U.S.C. § 3632(d)(4)(C) (using the mandatory language "shall"). As more fully set forth below, beyond the text of the statute itself, the FSA's legislative history further supports the mandatory and non-discretionary nature of an eligible prisoner's right to prerelease transfer. Congressional statements across political party lines make clear that the FSA was designed to reshape the federal criminal justice system by encouraging participation in recidivism-reduction programs and activities, thus lowering the prison population and reducing costs to taxpayers. That purpose necessarily requires the prompt transfer of eligible individuals to prerelease custody or supervised release so they spend additional time rehabilitating in the community as intended, while those still in prison are incentivized to take part in the programming.

Moreover, Congress's confidence in the value of FSA programming and earned time credits is borne out by the statistics relating to the recidivism of individuals released under the FSA. Not only does this cohort of prisoners have significantly low rates of recidivism, they have lower rates of recidivism than similarly-situated individuals released prior to the FSA. Thus, the FSA is meeting its goals of promoting rehabilitation and lowering recidivism in the federal prison system.

## Argument

## I

## THE LEGISLATIVE HISTORY OF THE FIRST STEP ACT MAKES CLEAR THAT CONGRESS INTENDED THAT THE BUREAU OF PRISONS TRANSFER ELIGIBLE PRISONERS TO PRERELEASE CUSTODY OR SUPERVISED RELEASE AS SOON AS THEY BECOME ELIGIBLE

In ascertaining the meaning and scope of a statute, legislative history provides valuable insight into congressional intent. *See North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 522 (1982) (relying on legislative history to understand the scope of Title IX). It is clear from the Congressional Record and unequivocal statements from legislators across political party lines that Congress intended the



Appellate Case: 25-3090 Page: 8 Date Filed: 12/12/2025 Entry ID: 5587699

FSA to transform the criminal justice system. The statute's aims are ambitious, with the goal of incentivizing participation in recidivism-reduction programming and activities, saving costs incurred by taxpayers, and reducing the overall prison population. It follows that Congress intended the FSA to require immediate transfer of eligible prisoners to prerelease custody or supervised release.

### A. Congress Intended that the First Step Act Effectuate the Most Comprehensive Reform Possible, which Aligns with Mandating that Incarcerated Individuals Immediately be Transferred upon Eligibility

The First Step Act was seen by some as "the most significant bill to reform [America's] criminal justice system in nearly a decade." 164 Cong. Rec. S7749 (daily ed. Dec. 18, 2018) (statement of Sen. Patrick Leahy). In arguing for the Act's passage, Senator Blumenthal predicted that its criminal justice reforms "will be cited as an exemplar of American ideals of liberty and justice." *Id.* at S7745 (statement of Sen. Richard Blumenthal). He went further to say the FSA would bring "balance back to [America's] criminal justice system." 164 Cong. Rec. S7745 (daily ed. Dec. 18, 2018) (statement of Sen. Richard Blumenthal).

As evidenced by the Act's legislative history, Congress intended the passage of the FSA to enact sweeping changes in America's criminal justice system. The



Appellate Case: 25-3090 Page: 9 Date Filed: 12/12/2025 Entry ID: 5587699

FSA included a number of reforms to restore needed balance, such as banning the shackling of pregnant prisoners, giving the judiciary more discretion in sentencing, and, most importantly for this case, creating a system in which incarcerated individuals can earn time credits towards their early release and time in the community by participating in recidivism-reduction programming and activities. *See id.* (describing the reforms implemented in the FSA); 18 U.S.C. §§ 3632-3633 ("A prisoner shall earn 10 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities.").

In pursuit of its goal of bringing balance, the FSA was intended to drastically improve and reorient the criminal justice system of the United States towards rehabilitation and recidivism reduction. This can only happen, though, if the BOP complies with the Act's mandates.

To further Congress's goal of sweeping reform, the FSA must apply as comprehensively as possible. Congress intended that eligible incarcerated individuals who take part in recidivism-reduction programming and activities be rewarded with time in the community towards the end of their sentences. This reinforces the programming taken in prison because individuals in halfway houses,



Appellate Case: 25-3090 Page: 10 Date Filed: 12/12/2025 Entry ID: 5587699

on home confinement, or under supervised release enjoy markedly greater opportunities to reconstruct their post-incarceration lives – rebuilding family connections, securing housing and employment, and engaging in treatment and educational programs. These conditions cultivate the social bonds and practical skills that support lawful reintegration and reduce the likelihood of recidivism. *See*, *e.g.*, *United States v. Kimball*, 830 F.3d 747 (8th Cir. 2016) (acknowledging that "temporary residence at [a half-way house] is designed to facilitate successful reentry to the community" and that courts believe defendants' "chances of success outside of prison would be enhanced by productive stint at a reentry center"); *United States v. Dixon*, 546 F.Supp.2d 1198 (D. Kan. 2008) (recognizing "[t]he State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among those serving their sentences at halfway houses"). Mandated transfer upon reaching eligibility, thereby maximizing an eligible individual's opportunities for reintegration, is essential to honor Congress's intent for the FSA to effectuate broad and systemic criminal justice reform.



Appellate Case: 25-3090 Page: 11 Date Filed: 12/12/2025 Entry ID: 5587699

**B. The First Step Act Largely Focuses on Reducing Recidivism through Effective Programming for Incarcerated Individuals, and Participation in this Programming is Incentivized Only if Transfer Occurs as Required Under the First Step Act**

The First Step Act's legislative history also makes clear that a primary focus of the Act was to lower recidivism rates among federal prisoners. In arguing for the Act's passage, Senator John Cornyn, a key sponsor of the Act, focused on a study from the United States Sentencing Commission that found that nearly half the people released from federal prison in 2005 had re-offended and been re-arrested within the next eight years. 164 Cong. Rec. S7746 (daily ed. Dec. 18, 2018) (statement of Sen. John Cornyn). He referenced this study to emphasize that one of the FSA's main aims was lowering recidivism rates. In referencing his home state of Texas's similar criminal justice reforms, Senator Cornyn described how he hoped to see state-level successes reflected at the federal level through the FSA's "Evidence-Based Recidivism Reduction Programs" and "Productive Activities." *Id.* (describing how states that have implemented similar recidivism reduction programs saw dramatically decreased re-offense rates).

Despite these encouraging findings at the state level, Congress recognized that the success they hoped to achieve with the Evidence-Based Recidivism



Appellate Case: 25-3090 Page: 12 Date Filed: 12/12/2025 Entry ID: 5587699

Reduction Programs and Productive Activities would not happen unless incarcerated individuals actually took part in those programs. Senator Cornyn phrased it this way: "We, as human beings, all operate based on incentives." *Id.* The incentive for incarcerated individuals to participate in recidivism reduction programming, including addiction-support programs and job training, is to "gain the earned credit so that they can be released . . . [to] less confining conditions." *Id.*

If the BOP does not immediately transfer inmates when they achieve the requisite number of credits, the incentive to participate in the programming vanishes. Prisoners will be far less inclined to participate in recidivism-reduction programming if their transfer still turns on the BOP's discretionary judgment. That simply replicates the pre-FSA status quo under the Second Chance Act, where early community placement depended on the BOP's judgment rather than on earned incentives. 18 U.S.C. § 3624(c) ("The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community," without limiting BOP's placement authority at 18 U.S.C. § 3621); 18 U.S.C. § 3621(b)

(listing factors to consider when designating the place of the prisoner's imprisonment). The problem is even more pronounced under the FSA, because Congress – together with the BOP through the PATTERN risk assessment tool – has already subjected a large subset of the population to discretionary transfer decisions: individuals assessed as medium or high risk, who do require the warden's approval to use their earned time credits. 18 U.S.C. § 3624(g)(1)(D)(i)(II). It would make little sense to layer additional, extra-textual discretion onto the group Congress expressly intended to receive the automatic benefit: those classified as minimum or low risk. Such a reading would erase the very incentive structure the FSA was designed to create.

The majority of incarcerated individuals will not remain in prison – 94% of people incarcerated in federal and state prisons will be released. Monique O. Esitelu, *Equipping Individuals for Life Beyond Bars*, NEW AM. (Nov. 4, 2019), https://www.newamerica.org/education-policy/reports/equipping-individuals-life-beyond-bars. The FSA's legislative history showcases that Congress intended for these post-incarceration offenders to reenter society as individuals with a "chance to go out there as [] innocent [people] who [are] just trying to lead a life." 164 Cong. Rec. S7748 (daily ed. Dec. 18, 2018) (statement of Sen. Amy Klobuchar).

Congress chose to honor this goal through the introduction of Evidence-Based Recidivism Reduction Programs and Productive Activities. 18 U.S.C. § 3633. However, Congress also realized that this goal could not be achieved without providing incentives to incarcerated individuals to participate in the programming.

Congress could have chosen to provide recidivism reduction programming without the credit earning potential – the programming on its own is beneficial, after all. Their deliberate choice to add in the incentive of transfer and release upon earning enough credits cannot be ignored. It shows that Congress did not only want to provide recidivism reduction programming, but for it to be widely used by incarcerated individuals and to lead to less stringent confinement for those who earn enough credits.[2] This incentive loses all meaning if transfer is not required upon eligibility.

The legislative history of the First Step Act makes clear that a central objective of the statute was to reduce recidivism among federal prisoners. That objective depends on a credible incentive structure: individuals will commit to the

---

[2] Congress's belief in providing incentives is buttressed by the fact that even prisoners who are not eligible to earn time credits under the FSA because of their conviction still have incentives to take part in programming. 18 U.S.C. § 3632(d)(3)(detailing that prisoners who take part in programming can earn non-time credit incentives such as increased commissary limits and products, more email access, or transfers to better housing units).

demanding, months-long recidivism-reduction programming only if they can trust that the earned time credits will be promptly applied and that transfer will follow as soon as they become eligible. If transfers are delayed or treated as discretionary, the promise of earlier release becomes illusory. And once prisoners perceive that the benefit is uncertain or unlikely to materialize, the incentive to engage fully in programming evaporates – undermining Congress's goal of reducing recidivism.

### C. A Primary Goal of the First Step Act Was to Save Taxpayer Money and Dedicate Resources to More Effective Public Safety Programs, and Such Savings Can Only Be Achieved if Transfer Occurs Immediately Upon Eligibility

The legislative history demonstrates that another key aim of the First Step Act was to reduce the prison population, thereby cutting down on unnecessary prison costs. Federal prison costs made up nearly one-third of the Department of Justice's budget at the time of the First Step Act's passage. *See* 164 Cong. Rec. S7749 (daily ed. Dec. 18, 2018) (statement of Sen. Leahy). Fiscal concerns drove the sweeping bipartisan support the legislation accumulated, passing with margins of 87-12 in the Senate and 358-36 in the House. *See* 164 Cong. Rec. S7781 (daily ed. Dec. 18, 2018) (Senate margin); 164 Cong. Rec. H10430 (daily ed. Dec. 20, 2018) (House margin).

Senator John Cornyn summarized the FSA as a powerful tool in breaking the "perpetua[l] cycle of crime that continues to plague communities across the country and to drain taxpayer dollars in the process . . . ." *See* 164 Cong. Rec. S7642 (Dec. 17, 2018) (statement of Sen. John Cornyn); *see also id.* at S7644 (Dec. 17, 2018) (statement of Sen. Dick Durbin) (explaining that the First Step Act set out to reduce the Federal prison population). Congress recognized that the billions of tax-payer dollars spent on prisons and incarceration would be better spent on programs with proven safety-enhancing results, such as the Evidence-Based Recidivism Reduction programs and Productive Activities. 18 U.S.C. § 3633; *see* 164 Cong. Rec. S7744 (daily ed. Dec. 18, 2018) (statement of Sen. Dick Durbin) ("[W]e don't want to waste any more time here. We want to focus tax dollars on programs that have proven results . . . . By participating in [the Evidence-Based Recidivism Reduction programs], [prisoners] can reduce the time they serve or be released to a halfway house or something similar to that. That is what this is all about . . . ."). Congress envisioned that transitioning individuals out of prison, while equipping them with the tools for successful reintegration into society, would further reduces future spending. As Representative Bob Goodlatte, a supporter of the First Step Act, explained, "[f]ewer recidivists mean fewer



Appellate Case: 25-3090 Page: 17 Date Filed: 12/12/2025 Entry ID: 5587699

prisoners in the future. It means greater savings to the American Taxpayer . . . ." 164 Cong. Rec. H4311 (daily ed. May 22, 2018) (statement of Rep. Bob Goodlatte).

By reducing unnecessary costs, the First Step Act was intended to enable such resources to be spent on public safety measures. As highlighted by Senator Richard Blumenthal, "[t]he Federal Government currently spends billions every year maintaining [the] prison population—the largest in the world. If we really want to keep people safe, there should be more dedication of resources to State and local enforcement, who patrol our streets, keep our communities safe, and provide role models for many of our young people." 164 Cong. Rec. S7744 (daily ed. Dec. 18, 2018) (statement of Sen. Richard Blumenthal). During floor debate, Senator Leahy similarly noted that "[b]ecause public safety dollars are finite, [the cost of housing federal offenders] strips critical resources away from law enforcement strategies that have been proven to make our communities safer." *Id.* at S7749.

The critical taxpayer savings envisioned on both sides of the political aisle can only be achieved if the prisoners who become eligible by participating in such recidivism programs are, in fact, transferred as quickly as possible to prelease custody or supervised release. Without transfer immediately upon eligibility, such

savings will not be realized because the prison population will remain high. Much like how incentives for prisoners to participate in the recidivism reduction programs and activities only exist if participation actually results in a transfer, the broad cost-savings goal is only achieved if eligible prisoners are transferred, thereby decreasing the prison population and the attendant taxpayer burden. The BOP estimated that it cost $120.80 per day to house a prisoner in a BOP facility in 2023, compared to $113.53 in a Residential Re-Entry Center (half-way house). *See Annual Determination of Average Cost of Incarceration Fee (COIF)*, BOP (Dec. 6, 2024), https://www.federalregister.gov/documents/2024/12/06/2024-28743/annual-determination-of-average-cost-of-incarceration-fee-coif. It costs $55.26 per day to house someone on home confinement. *See* Department of Justice, "*Home Confinement Under the Coronavirus Aid, Relief, and Economic Security (Cares) Act*," 88 FR 19830 (April 4, 2023).

Senator Grassley succinctly summarized the First Step Act's purpose as "[making] the system work better for the taxpayers, [helping] law enforcement fight crime, and [putting] a stopper in the revolving prison door." 164 Cong. Rec. S7838 (daily ed. Dec. 19, 2018). In a rare moment of bipartisan support, members of Congress on both sides of the aisle sweepingly endorsed these critical reforms.



Appellate Case: 25-3090 Page: 19 Date Filed: 12/12/2025 Entry ID: 5587699

These goals are only actualized when the BOP heeds the call of Congress and transfers prisoners to prerelease custody immediately upon eligibility.

## II

## INDIVIDUALS RELEASED UNDER THE FSA HAVE SIGNIFICANTLY LOWER LEVELS OF RECIDIVISM THAN SIMILARLY SITUATED INDIVIDUALS PRIOR TO THE FSA

Congressional confidence in the value of FSA programming and earned time credits is borne out by recidivism statistics collected by the BOP and the United States Office of the Attorney General (USAGO) in 2020 through 2024. *See* Avinash Bhati, *First Step Act: An Early Analysis of Recidivism*, COUNCIL ON CRIM. JUST. (Dec. 2024), [hereinafter *2024 FSA Recidivism Analysis*], https://counciloncj.foleon.com/first-step-act/fsa (noting that the BOP and USAGO statistics include both those released directly under the FSA and those who were released under a different release code but benefited from the FSA). These statistics demonstrate that individuals released under the FSA have significantly low rates of recidivism.[3] To assess recidivism, the BOP tracks individuals released under the FSA after they complete both their term of imprisonment and any pre-

[3] *See infra* Table A.



Appellate Case: 25-3090 Page: 20 Date Filed: 12/12/2025 Entry ID: 5587699

release supervision including home confinement. *See First Step Act: An Early Analysis of Recidivism*, COUNCIL ON CRIM. JUST., at 1 n.3, https://assets.foleon.com/eu-central-1/de-uploads-7e3kk3/41697/fsa_early_analysis_of_recidivism_methodology_2024.971b9049482d.pdf?first-step-act (last visited Nov. 20, 2025) (supplemental methodology report to *2024 FSA Recidivism Analysis*). Importantly, comparing recidivism rates of individuals released under the FSA to (1) all people released from BOP facilities in the same time frame and (2) similarly situated individuals released prior to the FSA, those who were released under the FSA have the lowest recidivism.[4] Moreover, even fewer individuals released under the FSA recidivate by committing a new crime as opposed to those who return to BOP custody due to technical violations.[5] These statistics show that the FSA has successfully promoted rehabilitation and lowered recidivism in the federal prison system.

### A. Individuals Released Under the FSA Have Low Recidivism Rates

The USAGO produces annual reports detailing the recidivism rates of individuals released under the FSA. The four reports published to date show the

---

[4] *See infra* Table B.
[5] *See infra* Figure A.



Appellate Case: 25-3090 Page: 21 Date Filed: 12/12/2025 Entry ID: 5587699

FSA's success in reducing recidivism through the overall high number of individuals who have not recidivated since their release. Of the first 7,251 individuals released under the FSA by September 2020, 88.7% did not recidivate. *The Attorney General's First Step Act Section 3634 Annual Report*, OFF. ATT'Y GEN., Dec. 2020, at 21–24, https://www.ojp.gov/Attorney-Generals-First-Step-Act-Section-3634-Annual-Report-December-2020.

By December 2021, 8,234 of the total 9,791 individuals released under the FSA did not recidivate. *First Step Act Annual Report*, OFF. ATT'Y GEN., Apr. 2022, at 53–56, https://www.ojp.gov/first-step-act-annual-report-april-2022. Only 12.4% of the total 29,946 individuals released under the FSA had recidivated by January 2023. *First Step Act Annual Report*, OFF. ATT'Y GEN., Apr. 2023, at 40–43, https://www.bop.gov/inmates/fsa/docs/first-step-act-annual-report-april-2023.pdf. The most recent data shows that 90.3% of the total 44,673 individuals released under the FSA by January 2024 had successfully reentered the community and had not recidivated. *First Step Act Annual Report*, DEP'T JUSTICE, June 2024, at 40–44 [hereinafter *DOJ 2024 Report*], https://www.bop.gov/inmates/fsa/docs/first-step-act-annual-report-june-2024.pdf.



Appellate Case: 25-3090 Page: 22 Date Filed: 12/12/2025 Entry ID: 5587699

That is, 40,345 individuals released under the FSA by January 2024 were effectively reintegrating into society. *Id.*

**Table A**

| Date | Total Individuals Released Under FSA | Percent Not Recidivating | Percent Recidivating |
|---|---|---|---|
| January 2024 | 44,673 | 90.3% | 9.7% |
| January 2023 | 29,946 | 87.6% | 12.4% |
| December 21 | 9,791 | 84.1% | 15.9% |
| September 2020 | 7,251 | 88.7% | 11.3% |

### B. Individuals Released Under the FSA Are Significantly Less Likely to Recidivate Compared to All People Released from BOP Facilities

Not only do individuals released under the FSA have a low recidivism rate, this recidivism rate is also *significantly lower* compared to rates of all other individuals released from BOP facilities in the same period. In 2023, the recidivism rate for individuals released under the FSA was only 12.4%, which is considerably lower than the 46.2% recidivism rate for all people released from BOP facilities. Avinash Bhati, *First Step Act: An Early Analysis of Recidivism*, COUNCIL ON CRIM. JUST. (Aug. 2023) [hereinafter *2023 FSA Recidivism Analysis*], https://counciloncj.foleon.com/first-step-act/fsa/2023-first-step-act-recidivism-



Appellate Case: 25-3090 Page: 23 Date Filed: 12/12/2025 Entry ID: 5587699

analysis. By 2024, individuals released under the FSA *again* had significantly lower recidivism rates compared to all people released from the BOP – only 9.7% of individuals released under the FSA recidivated compared to 44.8% of all people released from BOP facilities. *Id.*

### C. Individuals Released Under the FSA are Less Likely to Recidivate than Similarly Situated People Released Prior to the FSA

Although individuals who are released under the FSA are generally non-violent and low risk, they have a lower recidivism rate than individuals who had similar risks of reoffending and similar amounts of time in the community that were released prior to the FSA. Raquel Wilson, *A Critical Assessment of the First Step Act's Recidivism-Reduction Measures*, 128 DICK. L. REV. 461, 480–81 (2024), https://insight.dickinsonlaw.psu.edu/dlr/vol128/iss2/3 (criticizing how the FSA excludes violent offenders, resulting in a missed opportunity for reducing risk of reoffending for individuals who have the highest recidivism rates). This is true across all risk levels as assessed by the BOP.[6]

In 2023, these similarly situated individuals released prior to the FSA had an estimated recidivism rate of 19.8%. *See 2023 FSA Recidivism Analysis*. This

[6] *See infra* Graph A.



Appellate Case: 25-3090 Page: 24 Date Filed: 12/12/2025 Entry ID: 5587699

means that individuals released under the FSA had a recidivism rate that was 37% lower than individuals released prior to the FSA who had similar risks of reoffending and had similar amounts of time in the community. *Id.* A comparison of arrests nationwide between the two groups further reveals the difference in recidivism. Individuals released under the FSA accounted for only 0.021% of all arrests nationwide, whereas similarly situated individuals made up 0.037% of all arrests. *Id.* Put another way, 21 out of every 100,000 arrests involved individuals released under the FSA, whereas 37 out of every 100,000 arrests involved similarly situated individuals. *Id.* Overall, similarly situated individuals had 3,125 more arrests than individuals who were released under the FSA. *Id.*



Appellate Case: 25-3090 Page: 25 Date Filed: 12/12/2025 Entry ID: 5587699

**Graph A**

*Recidivism Rates and PATTERN Risk Levels in 2023–24*




Source*: 2024 FSA Recidivism Analysis; see also DOJ 2024 Report* at 8–10 ("PATTERN" stands for "Prisoner Assessment Tool Targeting Estimated Risks and Needs" and refers to the risk instrument used by the BOP).

The differences between individuals released under the FSA and their similarly situated counterparts became further exacerbated in 2024. Similarly situated individuals released prior to the FSA had an estimated recidivism rate of



Appellate Case: 25-3090 Page: 26 Date Filed: 12/12/2025 Entry ID: 5587699

21.5% in 2024. *See 2024 FSA Recidivism Analysis*. Comparing the two, individuals released under the FSA have a recidivism rate that was 55% lower than similarly situated individuals released prior to the FSA. *Id.* The two groups also differed in nationwide arrests. Individuals released under the FSA accounted for approximately 0.027% of arrests nationwide. *Id.* This equates to 27 out of every 100,000 arrests. *Id.*. In contrast, individuals released prior to the FSA who had similar risk levels and time since release from prison account for approximately 0.045% of arrests nationwide, or 45 out of every 100,000 arrests. *Id.* Overall, people released under the FSA experienced 4,837 fewer arrests than similarly situated individuals. *Id.*

**Table B**

| Date | Recidivism Rate of Individuals Released Under the FSA | Recidivism Rate of Similarly Situated Individuals Released Prior to the FSA | Recidivism Rate of All People Released from BOP Facilities |
|---|---|---|---|
| January 2024 | 9.7% | 21.5% | 44.8% |
| January 2023 | 12.4% | 19.8% | 46.2% |



Appellate Case: 25-3090 Page: 27 Date Filed: 12/12/2025 Entry ID: 5587699

### D. When Distinguishing Between Recidivism Due to Technical Violations and New Criminal Activity, Recidivism of Individuals Released Under the FSA is Even Lower

The statistics show that the FSA has successfully promoted rehabilitation and reduced recidivism, but they may not fully account for the full extent of the FSA's success. The BOP defines "recidivism" as "either a return to BOP custody or an arrest by federal, state, or local authorities." *DOJ 2024 Report* at 41; Avinash Bhati, *Technically Speaking: Accounting for Technical Violations in First Step Act Recidivism*, COUNCIL ON CRIM. JUST. (Dec. 2023) [hereinafter *Accounting for Technical Violations*], https://counciloncj.foleon.com/first-step-act/fsa/technical-violations (distinguishing definition of "recidivism").

However, this definition does not account for returns to custody due to technical violations rather than new criminal activity. *See Accounting for Technical Violations*. In 2023, 31% of revocations resulted from technical violations; new criminal history caused the remaining 69% of revocations. *Id.* When applied to the 12.4% recidivism rate of individuals who were released under the FSA as of 2023, this ratio reveals that only 8.5% recidivated by being rearrested and charged with a new crime, whereas 3.9% returned to federal prison for technical violations. *Id.* When this ratio is applied to arrests, people release



Appellate Case: 25-3090 Page: 28 Date Filed: 12/12/2025 Entry ID: 5587699

under the FSA could have accounted for an estimated 2,885 arrests at most and decreases to account for approximately 0.014% of arrests nationwide—that is, during that period, individuals released under the FSA would account for only 14 out of every 100,000 arrests. *Id.* These numbers show that recidivism rates may actually be even lower than suggested by the BOP and USAGO's reports.

**Figure A**




Source*: Accounting for Technical Violations*.

These strong recidivism outcomes demonstrate that the First Step Act is operating as Congress envisioned. Participants undertook recidivism-reduction



Appellate Case: 25-3090 Page: 29 Date Filed: 12/12/2025 Entry ID: 5587699

programming prior to release because it offered a meaningful pathway to early release. And their low recidivism rates indicate the programming was impactful. The FSA incentive structure, however, depends on the certainty that the earned benefit will be honored. Timely mandatory transfers are thus essential to maintaining the Act's effectiveness.



Appellate Case: 25-3090 Page: 30 Date Filed: 12/12/2025 Entry ID: 5587699

## Conclusion

For the reasons stated above and the reasons set forth in Appellant's brief, the Court should reverse the District Court's holding that it lacked jurisdiction and remand with instructions to grant Mr. Osorio-Calderon's habeas petition or, alternatively, reverse the District Court's holding that the BOP does not have a duty to transfer Mr. Osorio-Calderon under the FSA and remand with instructions to grant Mr. Osorio-Calderon a writ of mandamus securing his transfer.

Dated: December 10, 2025
Minneapolis, Minnesota

Respectfully submitted,

/s/ JaneAnne Murray
JANEANNE MURRAY

*Attorney for Amicus Curiae*

**Certificate of Compliance**

This brief complies with the type-volume limitation of Fed. R. App. 32(g) in that the brief contains 4,471 words according to the word-processing program used to prepare the brief. The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) in that the brief has been prepared in Times New Roman typeface in Word 2021 in 14 point size. The brief has been scanned for viruses and to the best of the undersigned's knowledge, is free of viruses.

Dated: Minneapolis, Minnesota
December 10, 2025

/s/ *JaneAnne Murray*
JaneAnne Murray



Appellate Case: 25-3090 Page: 32 Date Filed: 12/12/2025 Entry ID: 5587699

**Certificate of Service**

I hereby certify that on December 10, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: Minneapolis, Minnesota
December 10, 2025

/s/ *JaneAnne Murray*
JaneAnne Murray



Appellate Case: 25-3090 Page: 33 Date Filed: 12/12/2025 Entry ID: 5587699